UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

|  |  |
|---|---|
| ZHIPENG YIN, et al.<br><br>         *Plaintiffs*,<br><br>   v.<br><br>MANNY DIAZ, in his official capacity as Commissioner<br>of the Florida Department of Education, et al.,<br><br>       *Defendants*. | No. 1:24-cv-21129-JEM-EIS |

**DEFENDANTS' MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

The question in this case is whether Florida may, in hiring employees to conduct research at its public universities, account for the potential security risks posed by applicants who are visiting from certain totalitarian nations. Plaintiffs challenge Florida's SB 846, which was passed in 2023 with unanimous bipartisan support. They attack the modest limits the statute puts on collaborating with a "foreign principal" of China, Russia, Iran, North Korea, Cuba, Venezuela, or Syria in conducting research at Florida's public universities. Fla. Stat. § 288.860(1)(a)–(b)4, (3)(a)–(b). The statute does not prohibit such collaboration. It merely requires the State University System's Board of Governors to approve the arrangement, which is permissible if it is "valuable to students" and "not detrimental to the safety or security of the United States or its residents." *Id.* § 288.860(3)(d). The graduate assistantships at issue here required Board approval because the applicants were domiciled in China and thus were "foreign principals."

This pre-enforcement challenge alleges that SB 846 is preempted by federal law, violates the Equal Protection Clause, and is unconstitutionally vague. As a threshold matter, Plaintiffs lack standing because their universities have not even applied for Board approval of the proposed assistantships. So any injury to Plaintiffs is traceable to the universities, not the Board.

Even if they had standing, Plaintiffs' claims fail. The Supreme Court "has never held that every state enactment which in any way deals with aliens" is preempted. *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). "The case for inferring intent [to displace state decision-making] is at its weakest where, as here, the rights asserted [would] impose *affirmative* obligations on the States," rather than "simply prohibit[ing] certain kinds of state conduct." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981). Florida's regulation of its own employment process is in perfect harmony with the F-1 visa program because everything about the F-1 program turns on the discretionary choices of universities, meaning—in the case of public universities—choices made by the State. Before a foreign student may even apply for an F-1 visa, he must be accepted for admission as a student at a qualifying university. And to qualify to accept alien students at all, a university must—at its own election—apply for and be certified by the federal government. In other words, the F-1 visa program preserves, rather than displaces, the State's discretion in employment decisions. Plaintiffs' equal-protection and due-process claims fare no better.

The complaint should be dismissed.

## STATEMENT OF THE CASE

### I.      SB 846

In 2020, FBI Director Christopher Wray characterized "the counterintelligence and economic espionage threat from China" as "[t]he greatest long-term threat to our nation's information and intellectual property."[1] He explained that China had "pioneered an expansive approach to stealing innovation through a wide range of actors—including not just Chinese intelligence services but state-owned enterprises, ostensibly private companies," and "a whole variety of other

---

[1] Christopher Wray, *The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States*, FBI (July 7, 2020), https://tinyurl.com/yckbhtje. That continues to be the FBI's view of China. *See The China Threat*, FBI, https://tinyurl.com/42t5wmtc (last visited July 11, 2024).

actors working on their behalf," such as "graduate students and researchers," who are "targeting research on everything from military equipment to wind turbines to rice and corn seeds." Wray, *supra* note 1. Given the magnitude of the problem, Director Wray emphasized, the federal government "can't do it on [its] own; [it] need[s] a whole-of-society response." *Id.* The Secretary of State echoed the same sentiments, warning of China's "plan to recruit scientists and professors" to sell China "the know-how we have here."[2] Speaking to the National Governors Association, the Secretary advised that "China is not just a federal issue." *Id.* The State Department "need[s] your help, too," because "[w]hat China does in Topeka and Sacramento reverberates in Washington." *Id.*

The same year, the Speaker of the Florida House of Representatives appointed the House Select Committee on the Integrity of Research Institutions to investigate revelations that the CEO of a state-funded cancer-research institute "and three other officers or research scientists had failed to disclose support from relationships with Chinese talent and research programs."[3] "Following that disclosure, the University of Florida disclosed to the Select Committee that three of its research staff were under similar investigations." *Id.* The Select Committee then "undertook an extensive review of Florida's university-based research programs" and "found that Florida state research grants lacked certain requirements deemed reasonably necessary to ensure research integrity." *Id.* Beginning in March 2021, the Legislature began to consider "proposed legislation to combat foreign influence." *Id.* The goal was to "place strategic safeguards against foreign influence by strengthening institutional vetting and applying protections for Florida's institutions of higher education, public entities, and recipients of public grants or contracts." *Id.*

---

[2] Mike Pompeo, *U.S. States and the China Competition*, US-China Inst., Univ. So. Cal. (Feb. 8, 2020), https://tinyurl.com/hkd3esex.

[3] Fla. Senate, Comm. on Rules, *Bill Analysis and Fiscal Impact Statement, CS/CS/SB 846* at 3 (2023), https://tinyurl.com/yfy7ek34 (discussing the Select Committee's work in 2020).

That mission continued in 2023, when the Legislature enacted SB 846—the provision challenged here—with unanimous, bipartisan support.[4] SB 846 limits the authority of Florida's public universities to "participate in any agreement . . . with any foreign principal" of a foreign country of concern, meaning "a written statement of mutual interest in academic or research collaboration." Fla. Stat. § 288.860(1)(a)–(b)4, (3)(a)–(b). "Foreign principal[s]" include the governments of the seven foreign countries of concern, their public officials, and members of their political parties. *Id.* § 288.860(1)(b). To prevent evasion, "[f]oreign principal[s]" also include businesses with their principal place of business in those countries or that are organized under their laws, as well as "[a]ny person who is domiciled in" those countries and who is not "a citizen or lawful permanent resident of the United States." *Id.* § 288.860(1)(b)4. Those anti-circumvention provisions are consistent with the FBI Director's warning that hostile governments operate not only through "intelligence services," but also "other actors working on their behalf," including "graduate students and researchers." Wray, *supra* note 1. The Board of Governors has explained that an "agreement . . . with any foreign principal" includes "[h]iring a foreign principal for . . . research purposes."[5]

Like the federal government, Florida's "adversary is not" the individual whose "descent or heritage" lies in a foreign country of concern, but the "authoritarian government" that seeks to conscript or coerce him. *The China Threat*, FBI, *supra* note 1. SB 846 thus applies to covered principals regardless of their race, ethnicity, or national origin. It includes domiciliaries of foreign countries of concern because they are at greater risk of influence by the governments of their home countries. As the FBI has explained, those who intend to return to their home countries may be

---

[4] *CS/CS/SB 846* (2023), https://tinyurl.com/5cczun7y.

[5] Bd. of Governors, State Univ. Sys. of Fla., *Activity with Foreign Countries of Concern Guidance Document for State University System Institutions* 3 (2023) ("BOG Guidance"), https://tinyurl.com/44wrvfva.

victim to "transnational repression tactics" that totalitarian governments deploy against "their citizens (or non-citizens connected to the country)," such as "[s]talking," "[h]arassment," "[h]acking," and "[t]hreatening or detaining family members in the country of origin." *Transnational Repression*, FBI, https://tinyurl.com/bdhbtawy (last visited July 9, 2024).

Regardless, SB 846 permits state universities to collaborate with foreign principals. The statute simply requires individualized review of each case, authorizing state universities, "upon approval by the Board of Governors," to "enter into . . . an agreement . . . with a foreign principal, if such . . . agreement is deemed by the board to be valuable to students and the state university and is not detrimental to the safety or security of the United States or its residents." Fla. Stat. § 288.860(3)(d). The Board has made clear it anticipates approving such agreements unless they fail to meet that minimal standard, instructing "each university board of trustees" to "request approval from the Board of Governors" by "submit[ting] a request to the Board office" with information about the "[p]urpose and benefits of the agreement," "[a]ny identified risks of the agreement or partnership," and "[o]ther information as requested." Fla. Bd. Gov. R. 9.012(8)(c); *see* Fla. Stat. § 288.860(3)(g) (statutory grant of rulemaking authority to the Board of Governors).

No "foreign principal" or other private individual is subject to any penalty under the statute. The sole enforcement mechanism is that the Board of Governors may "sanction a state university," including by "withhold[ing] additional performance funding." Fla. Stat. § 288.860(3)(d)1–2.

## II.   FACTUAL BACKGROUND

Plaintiffs Yin and Guo are Chinese citizens currently enrolled as doctoral students at Florida International University ("FIU") in their respective fields of Computer Science and Materials Engineering. DE1 ¶¶ 10, 37–38. Each holds an F-1 visa. DE20-3; DE20-12. And each was admitted to his respective doctoral program at FIU along with an "accompanying offer of a graduate teaching assistantship" that included an annual stipend, tuition waiver, and health insurance. DE1

¶¶ 37–38; *see* DE20-6; DE20-13. After Yin and Guo accepted the university's offer and relocated to Florida, the university informed them that their assistantships were "deferred until . . . fully approved" by the Board of Governors under SB 846, which "will take several months." DE20-8 (letter dated Dec. 18, 2023); DE20-15 (letter dated Jan. 9, 2024). To date, FIU has not requested the Board's approval to hire Yin and Guo as graduate assistants. *See* DE26-1 at 2.

Plaintiff Guan is a professor at the University of Florida ("UF"). He alleges that SB 846 has "adversely affected [his] ability to recruit and hire the best candidates who have applied to work with [him] and assist in [his] research." DE20-1 at 2. He further alleges that in "fall 2023" he "sought to hire a postdoctoral candidate from China who was the best applicant, but was unsuccessful due to SB 846 and the more than four-month delay it caused." *Id.* at 3. Guan claims that "the candidate eventually decided to accept a competing offer outside of Florida due to SB 846's discriminatory impact against individuals from China." *Id.* Guan does not specify what state actions "due to SB 846" caused the delay or impact he alleges (or the state officials or employees who took such actions). To date, UF has not requested the Board's approval to hire any graduate assistant for Professor Guan. *See* DE26-1 at 2.

Plaintiffs filed their complaint on March 25, 2024, against the Commissioner of the Florida Department of Education and the members of the Board of Governors, but not against FIU or UF. DE1. Plaintiffs contend that the statute is preempted by federal immigration law. *See* DE1 ¶¶ 42–64. Yin and Guo also argue that the statute violates the Equal Protection Clause and is unconstitutionally vague in violation of the Due Process Clause. *See* DE1 ¶¶ 65–88.

## LEGAL STANDARD

At the pleadings stage, the Court must "assume the veracity of well-pleaded factual allegations," but must not credit mere "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (cleaned up). The well-pleaded allegations, "accepted as true," must be

sufficient "to state a claim to relief that is plausible on its face." *Id.* (cleaned up). The alleged facts must be "more than merely possible, and a plaintiff's allegations that are merely consistent with a defendant's liability will not be considered facially plausible." *Id.* (cleaned up). This "context spe-cific task" "requires the reviewing court to draw on its judicial experience and common sense in reviewing the plaintiff's allegations." *Id.* (cleaned up).

## ARGUMENT

The complaint must be dismissed because Plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). The complaint also fails to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

## I.   PLAINTIFFS LACK STANDING.

To have standing under Article III, Plaintiffs must show injury in fact, traceability, and redressability. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). This task is "substantially more difficult" when plaintiffs challenge "the government's allegedly unlawful reg-ulation . . . of *someone else*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). And because "standing is not dispensed in gross," Plaintiffs need standing "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And even on a motion to dismiss, the court may consider evidence outside of the pleadings to determine its jurisdiction. *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021).

**1.** Plaintiffs' alleged injuries are not traceable to Defendants, as their "grievance lies with absent third parties." *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 640 (11th Cir. 2023). Specifically, Plaintiffs' alleged injuries—lost research opportunities and financial harms—stem from decisions by FIU and UF, not the Board of Governors. *See* DE20-15 at 2 (deferring Yin's assistantship); DE20-8 at 2 (same for Guo). The challenged statute indeed requires public univer-sities to submit proposed research assistants to the Board for a security screening, but in this case, the universities did not do that. Plaintiffs' mistake in blaming the Board is perhaps understandable,

as FIU told them it was "defer[ring]" their assistantships because "[t]he process to obtain the necessary approvals will take several months." DE20-15 at 2; DE20-8 at 2. But FIU never followed through (neither did UF) and, as a result, the Board never had an opportunity to take action on the assistantships at issue. *See* DE26-1 at 2. Plaintiffs do not allege otherwise. Accordingly, they lack standing because their alleged injuries are traceable only to "absent third parties." *City of S. Miami*, 65 F.4th at 640; *Walters v. Fast AC, LLC*, 60 F.4th 642, 650–51 (11th Cir. 2023) (no traceability where there is an "independent source" of "the same injury"); *cf. Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (holding that a plaintiff lacks standing to challenge a law when he has not "actually appl[ied] for the desired benefit").

It is no answer that SB 846 authorizes the Board to "sanction a state university" by "withhold[ing] additional performance funding." Fla. Stat. § 288.860(3)(d). Sanctions are possible only if a university, "without approval of the board, enters into a partnership or an agreement" in violation of the statute. *Id.* Because sanctions are not possible when a university merely submits a request for approval that is ultimately denied, the universities' decisions here (and any injuries caused by them) cannot be traceable to the threatened enforcement of the statute.

**2.** Professor Guan lacks Article III standing for the additional reason that his alleged future injury rests on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Professor Guan claims that he will be unable to "recruit and hire the best candidates," solely based on his failure to hire a single student from China in Fall 2023. DE20-1 ¶¶ 12–15. Professor Guan has failed to show that this lapse had anything to do with SB 846, let alone the Board, as opposed to UF. He blames a four-month delay in processing the student's application under SB 846, DE20-1 ¶ 14, but he does not show that (1) SB 846 even applied to this particular student, (2) the delay was caused by anything other than bureaucratic inefficiency at UF, or (3) the

student did not decide to withdraw his application for other reasons that had nothing to do with SB 846. And even if Professor Guan had established that an action of the Board in enforcing SB 846 contributed to this applicant's decision to go elsewhere, proving that this incident will likely recur requires showing that (1) a student domiciled in a foreign country of concern who is not a U.S. citizen or lawful permanent resident would apply to UF and apply to work for Professor Guan, (2) this future student would be materially better than the other applicants, (3) UF would apply on behalf of the student to the Board, and (4) the Board would deny the application. That sequence of events is far too conjectural to be "certainly impending." *Clapper*, 568 U.S. at 414.

Professor Guan also lacks prudential standing. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975). SB 846 does not apply to him; instead, Professor Guan asserts that he will suffer harm from SB 846's application to third parties—postdoctoral candidates he seeks to hire. *See* DE20-1 at 3. Because his claim rests on those candidates' legal rights, he must show "a 'close' relationship with" those candidates, and "a 'hindrance' to the [candidates'] ability to protect [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Professor Guan cannot make those showings.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

### A.   SB 846 is not preempted by federal law (Counts I and II).

Plaintiffs first contend that SB 846 is preempted by federal immigration law. As a general matter, "[p]re-emption may be either expressed or implied." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (plurality op.). Plaintiffs do not argue that SB 846 is expressly preempted, and with good reason, as the relevant federal statutes lack "pre-emptive language." *Id.* Instead, Plaintiffs argue that SB 846 is impliedly preempted because it conflicts with federal law.

That contention is not sound. The Supreme Court "has never held that every state enactment which in any way deals with aliens" is preempted. *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded by statute on other grounds*; *see also Kansas v. Garcia*, 589 U.S. 191, 195,

212–13 (2020). To the contrary, even in the immigration context, "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). Plaintiffs challenge Florida's rules for awarding graduate assistantships and attendant benefits in the State's own public universities. But "[s]tates possess broad authority under their police powers" over even purely private "employment relationship[s]." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *DeCanas*, 424 U.S. at 356). And states have even greater power over their own spending decisions and employment relationships. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("[T]he government as employer indeed has far broader powers than does the government as sovereign." (citation omitted)). Thus, "[t]he case for inferring intent [to displace state decision-making] is at its weakest where, as here, the rights asserted [would] impose *affirmative* obligations on the States" to spend their own money, rather than "simply prohibit[ting] certain kinds of state conduct." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981); *see Md. Psych. Soc., Inc. v. Wasserman*, 102 F.3d 717, 721 (4th Cir. 1996) ("*Pennhurst* does not permit the federal courts to connive in this sort of ambush of state treasuries.").

**1.** Plaintiffs have not surmounted the "high threshold" that must be met for conflict preemption. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2012) (citation omitted). To clear that threshold, they must show that Congress "confer[red] a federal right to be free from" state regulation. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018). Plaintiffs first contend that SB 846 is preempted because it is inconsistent "with nationwide employment rights via the federal government's exclusive authority over the nation's immigration system." DE1 ¶ 56. But the federal regulations Plaintiffs invoke do not establish any "right" to be employed by anyone, let alone a state government. The regulations "authorize" student employment only in that they

shield employers and F-1 students from *federal* penalties that would otherwise apply, *see* 8 U.S.C. §§ 1255(c)(2), (c)(8), 1227(a)(1)(C)(i), 1324a(a)(1); 8 C.F.R. § 214.1(e)), thus enabling (rather than undermining) the exercise of hiring discretion.

Here, Florida's law operates well within the employer's hiring discretion that federal law creates. The F-1 visa program at issue here effectuates the choices of universities, meaning—in the case of public universities—choices by the State. Before a foreign student may even apply for an F-1 visa, he must apply for and be accepted for admission as a student at a qualifying university—a decision entirely within the university's discretion. *See Applying for a Visa to Travel to the United States*, U.S. Dep't of Homeland Security, https://tinyurl.com/yc2wdhea (last visited July 11, 2024); 8 C.F.R. § 214.2(f)(1)(i)(A). And to qualify to accept alien students at all, a university must—in its discretion—"apply for and have been granted Student and Exchange Visitor Program (SEVP)-certification." *Certification*, U.S. Dep't of Homeland Security, https://tinyurl.com/3b8crcet (last visited July 11, 2024); *see* 8 C.F.R. § 214.3(a)(1).

There is also no indication Congress left the states with any less discretion in choosing whether to employ F-1 students than it left the states in choosing whether to participate in the F-1 process at all and, if they do, in choosing whether to admit or deny admission to any given student. After all, "[o]n-campus employment"—which Plaintiffs seek here[6]—"must be an integral part of the student's educational program," 8 C.F.R. § 214.2(f)(9)(i), and "[o]n-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study," 8 C.F.R. § 214.2(f)(6)(i)(H), (f)(6)(iii). The work "must either be performed on the school's premises . . . or at an off-campus

---

[6] Other employment for F-1 students requires case-by-case work authorization by USCIS, at the request of the student's university. 8 C.F.R. § 214.2(f)(9)(ii)(F)(1), (f)(10). Plaintiffs do not claim that they have sought such authorization or that they would qualify for it in any event.

location that is educationally affiliated with the school," *id.* § 214.2(f)(9)(i), and "[f]oreign students are severely restricted in terms of the number of hours that they may work." *United States v. Tongo*, 16 F.3d 1223, *1 n.1 (6th Cir. 1994) (per curiam) (citing 8 C.F.R. § 214.2(f)(9)). Were it otherwise, the student would run afoul of Congress's command that F-1 visas shall issue "solely for the purpose of pursuing" "a full course of study." 8 U.S.C. § 1101(a)(15)(F)(i).

In sum, Plaintiffs have identified no basis "in the text and structure of the statute at issue" to conclude that Congress intended the F-1 visa program to displace state discretion in hiring. *See Garcia*, 589 U.S. at 208. Were there any doubt, it would be resolved by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), which provides: "Notwithstanding any other provision of law," "a State is authorized to determine the eligibility for any State public benefits of . . . a nonimmigrant," which includes F-1 visaholders, 8 U.S.C. § 1622(a), including "postsecondary education" benefits, *id.* § 1621(c)(1)(B). Thus, whatever "any other provision of law" might say about the issue, Congress authorized Florida to make its own decisions about these kind of graduate teaching assistantships, with their attendant stipend, tuition waiver, and other benefits like health insurance. *See Estrada v. Becker*, 917 F.3d 1298, 1308 n.12 (11th Cir. 2019) (excluding DACA recipients from state universities was "consistent with 8 U.S.C. § 1621(a)" because "Congress decided which aliens are eligible for state . . . benefits, including postsecondary education benefits").[7]

---

[7] The term "state public benefits" excludes certain "contract[s] . . . for a nonimmigrant whose visa for entry is related to such employment in the United States." 8 U.S.C. § 1621(c)(2)(A). But the phrase "visa for entry . . . related to such employment" reads most naturally as a reference to employment visas, which often depend on a U.S. employer's sponsoring the alien with an offer of employment. An F-1 visa, by contrast, is "solely for the purpose of pursuing" "a full course of study." 8 U.S.C. § 1101(a)(15)(F)(i). Any employment is "incident" to that purpose. 8 C.F.R. § 214.2(f)(9). Congress's definition of "state public benefits" accounts for that difference by distinguishing between "contracts" and "licenses" on the one hand, *see* 8 U.S.C. § 1621(c)(1)(A), and "postsecondary education . . . benefit[s]" on the other, *see id.* § 1621(c)(1)(B).

**2.** There is no more merit to Plaintiffs' theory that SB 846 is preempted because it addresses "federal interests in national security" involved in "the federal government's grant of" a visa. DE1 ¶ 58. "[I]n the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Garcia*, 589 U.S. at 211–12.[8] SB 846 harmonizes with federal laws that exclude aliens who "seek[] to enter the United States" to violate "law[s] . . . relating to espionage or sabotage" or "prohibiting the export from the United States of goods, technology, or sensitive information," 8 U.S.C. § 1182(a)(3)(A); *id.* § 1201(g).

Plaintiffs argue that the federal security screening conducted during the visa application process is "exclusive" and that it vests in the recipient a right to be free of further scrutiny at the state level. DE1 ¶¶ 58–64. But that contention has no basis in the statute, let alone the "clear and manifest purpose of Congress," as is necessary for preemption. *Arizona*, 567 U.S. at 400. Congress understands federal immigration officials cannot identify every possible threat. A visa application will be rejected only if "it appears to the consular officer," based on the limited information before him—i.e., the alien's "statements in the application" and "the papers submitted therewith"—"that such alien is ineligible to receive a visa." 8 U.S.C. § 1201(g); *see id.* § 1182(a)(3)(A). And while a visa may later be revoked for any reason, *see* DE1 ¶ 51 (citing 8 U.S.C. § 1201(i)), nothing in that grant of authority suggests Congress was under the unrealistic impression that federal officials would be the nation's only line of defense against every threat.

That would be especially unrealistic with respect to the risks associated with graduate assistantships. "[O]n-campus employment" is deemed "incident to status" and may begin at any time.

---

[8] This does not cease to be true merely because a state law singles out aliens. The Court in *De Canas* upheld "California's attempt" "to prohibit the knowing employment" of illegally present aliens. 424 U.S. at 356. There, the Court refused to find preemption absent a "clear and manifest" showing that Congress intended "complete ouster of state power." *Id.* at 357.

8 C.F.R. § 214.2(f)(9)(i). A university could offer on-campus employment long after the student receives an F-1 visa, without clearing that decision with anybody in the federal government. Because "F-1 students engaged in on-campus employment are not required to apply for employment authorization with USCIS," *USCIS Policy Manual*, U.S. Citizenship and Immig. Servs., Chapter 6—Employment, https://tinyurl.com/jjs8a6sp (last updated June 28, 2024), the federal regime does not even contemplate that immigration officials will ordinarily be aware of on-campus employment, much less that they will comprehensively identify and mitigate the possible risks associated with it. Consular officers assessing a prospective F-1 student's visa application thus have no opportunity to assess the threat posed by on-campus employment. Accordingly, the most natural inference for all F-1 student employment (and at least on-campus employment) is that Congress did not forbid state and local officials from supplementing the federal government's national security review, just as the FBI Director and Secretary of State urged in 2020. *See supra* notes 1–2 and accompanying text. That makes sense because the states—through their universities and education officials—are in the best position to assess the risks associated with specific research positions in their universities. *Cf. Garcia*, 589 U.S. at 212 (even in the immigration context, "criminal law enforcement has been primarily a responsibility of the States, and that remains true today").

**3.** Plaintiffs fare no better in their argument that SB 846 is preempted because visa screenings consider whether admission "would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1182(a)(3)(C)(i); *see* DE1 ¶ 63. SB 846 is not a "foreign policy" or a diplomacy statute. *See Shen v. Simpson*, 687 F. Supp. 3d 1219, 1249 (N.D. Fla. 2023). As Plaintiffs acknowledge, it is a "security" statute, and they offer no explanation for how it would interfere with any foreign policy expressed in visa screenings. *See, e.g.*, DE1 ¶¶ 4, 6, 63–64. Nor could they. A visa grant signifies only that, at the time it was granted, the Secretary of State had

no "reasonable ground to believe" the alien posed sufficiently "serious" foreign policy risks to warrant denial of admission. 8 U.S.C. § 1182(a)(3)(C)(i). It would be quite a leap to infer that unspoken foreign affairs concerns *required* states to employ the alien after admission, especially in the context of the F-1 program, in which state participation is discretionary.

**4.** At a minimum, the preemption claims must be dismissed because Plaintiffs bring a facial challenge (as admitted at the preliminary-injunction hearing), and they have failed to establish that "no set of circumstances exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023). The complaint illustrates that offers of on-campus employment by a university to graduate students are often simultaneous with offers of admission to the school. DE1 ¶¶ 37–38. The statute thus contemplates that the Board's review will be completed before the student is offered admission, and thus prior to the federal government's issuing an F-1 visa, which is the earliest time at which any federal interest in the student's employment could attach.

**B.    SB 846 does not violate the Equal Protection Clause (Count III).**

Plaintiffs assert (DE1 ¶¶ 1, 72) that SB 846 is subject to strict scrutiny under the Equal Protection Clause because it (1) facially discriminates based on alienage; (2) uses domicile as a proxy to discriminate on the basis of race and national origin; and (3) is motivated by animus against people of Chinese race and national origin. None of these contentions is valid. The alienage and domicile classifications in SB 846 are subject to rational basis review, which the law survives easily. And the manifest purpose of SB 846—to prevent the theft of state research—has nothing to do with race or national origin.

**1.** SB 846 classifies based on alienage because it excepts individuals who are citizens or lawful permanent residents ("LPRs") of the United States from the law's reach. *See* Fla. Stat. § 288.860(1)(b)4. But that classification is subject to only rational-basis review.

The Supreme Court has made clear that "[i]t would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of 'strict scrutiny,' because to do so would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship.'" *Foley v. Connelie*, 435 U.S. 291, 295 (1978) (quoting *Nyquist v. Mauclet*, 432 U.S. 1, 14 (1977)). Simply put, not "all limitations on aliens are suspect." *Id.* at 294. The appropriate degree of scrutiny instead turns on the relationship between the alien and the United States.

At one end of the spectrum are illegal aliens, who "cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982) (quotation omitted). At the other end of the spectrum are LPRs, discrimination against whom "the Supreme Court has reviewed with strict scrutiny." *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005); *see League of United Latin Am. Citizens ("LULAC") v. Bredeson*, 500 F.3d 523, 532–33 (6th Cir. 2007). Such discrimination strikes "at the noncitizens' ability to exist in the community," which is "inconsistent with the congressional determination to admit the[se] alien[s] to permanent residence." *Foley*, 435 U.S. at 295.

That leaves the middle ground of temporary aliens, like Plaintiffs here. The Fifth and Sixth Circuits have both held that the exclusion of such aliens from state benefits and privileges is subject to rational-basis review. *LULAC*, 500 F.3d at 533 (permissible to limit driver's licenses to citizens and LPRs); *LeClerc*, 419 F.3d at 419–22 (permissible to limit Louisiana bar membership to citizens and LPRs).[9] As the United States argued in opposition to certiorari in *LeClerc*, the Supreme Court's holding "that alienage classifications are subject to strict scrutiny cannot be divorced from the context in which it appeared," because nonimmigrant aliens "are present only temporarily and

---

[9] The Second Circuit ruled differently in *Dandamudi v. Tisch*, but that case involved a law preventing any nonimmigrant from obtaining a pharmacist's license, even if they were domiciled in the United States. 686 F.3d 66, 71–72, 77 (2d Cir. 2012). SB 846 does not sweep so broadly.

subject to restrictions, and they do not ordinarily have the same ties to this country as permanent residents." Brief for the United States as Amicus Curiae, *Wallace v. Calogero*, Nos. 05-1645, 06-11 (U.S. May 23, 2007), 2007 WL 1520968, at *16–17. The Eleventh Circuit has thus followed *LULAC* and *LeClerc* in "declin[ing] to extend the Supreme Court's decisions concerning resident aliens to different alien categories"—in that case, DACA recipients. *Estrada*, 917 F.3d at 1310 (quoting *LeClerc*, 419 F.3d at 419).

SB 846 is more modest than the classifications upheld in *LULAC* and *LeClerc*, because it exempts not only LPRs but many temporary nonimmigrant aliens—those not domiciled in a foreign country of concern. SB 846 also concerns a benefit—postsecondary education—to whose denial the Eleventh Circuit "decline[d] to extend heightened scrutiny" in *Estrada*, 917 F.3d at 1310. *See also Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004) (applying rational-basis review to denial of benefits covered by PRWORA). Rational-basis review is thus appropriate here.

A state law satisfies rational-basis review so long as "there is *any* reasonably conceivable state of facts" on which the law serves a legitimate state purpose. *Estrada*, 917 F.3d at 1311 (citation omitted). With rational-basis review, statutes have "a strong presumption of validity," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), so Plaintiffs face a formidable burden. They must "negative every conceivable basis which might support" the law. *Id*. at 315 (citation omitted). Plaintiffs cannot.

**2.** Plaintiffs next contend (DE1 ¶¶ 1, 72) that SB 846 uses domicile as a "proxy" to discriminate based on race or national origin. The Court should reject this thinly veiled attempt at an end-run around *Washington v. Davis*, 426 U.S. 229 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). These cases held that a law is not "unconstitutional solely because it results in a racially disproportionate impact." *Arlington*

*Heights*, 429 U.S. at 264–65. It is true that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from" a law that "appears neutral on its face." *Id.* at 266. "But such cases are rare." *Id.* The common thread in those "rare" cases is that the official action is "unexplainable on grounds other than race." *Id.* In other words, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or pre-dominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). For example, "[a] tax on wearing yarmulkes is a tax on Jews" because only Jews wear yarmulkes and there is no other reason to draw that classification. *Id.* The Supreme Court has held that even classifications based on pregnancy are not necessarily a proxy for sex, explaining that, "[w]hile it is true that only women can become pregnant," "pregnancy is an objectively identifiable physical condition with unique characteristics" that can be rationally distinguished. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), *superseded by statute on other grounds*. Thus, classifications based on pregnancy are permissible "[a]bsent a showing that [they] are mere pretexts" for sex discrimination. *Id.*

The domicile classification in SB 846 is a rational response to the concern that totalitarian governments of foreign countries of concern are more likely to have influence over individuals in the United States who intend to return to their permanent homes in such countries. The FBI itself has warned about this. *See Transnational Repression*, FBI, *supra*. The classification here does not even approach the "irrational object of disfavor" needed to prove proxy discrimination.

**3.** SB 846 was not enacted with racial or national-origin-based animus. DE1 ¶ 72. Plaintiffs allege no facts that come close to overcoming "the presumption of legislative good faith" that attends any inquiry into legislative intent. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022).

Plaintiffs cite a press release by Governor DeSantis in which he explained that SB 846 was promulgated "to counteract the malign influence of the Chinese Communist Party [('CCP')] in the state of Florida." DE1 ¶¶ 24–25, 62. These are indeed the goals of SB 846, but far from proving discriminatory animus, the Governor's statements confirm that the target of SB 846 is the Chinese government, not the Chinese people. Even if Plaintiffs' cherrypicked statements show an awareness of a possible disparate impact, "awareness of consequences" is not enough. *Bray*, 506 U.S. at 271–72. Plaintiffs must show that the Legislature acted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The allegations in their complaint do not.

### C.   SB 846 is not vague (Count IV).

Plaintiffs finally take issue with the statute's use of the common law term "domicile" to determine whether a student is a "foreign principal." DE1 ¶¶ 75–88. "[A] civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (citation omitted). And routine issues of statutory interpretation do not render a statute vague. *United States v. Bronstein*, 849 F.3d 1101, 1107–08 (D.C. Cir. 2017). The vagueness standard is all the more deferential for statutes like SB 846 that regulate internal government operations, rather than private conduct. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 158–64 (1974) (plurality op.); *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 664–66 (6th Cir. 1987).

The common-law term "domicile" easily satisfies this minimal standard. Florida common law defines domicile as the place where a person is physically present and intends to remain permanently or indefinitely. *E.g.*, *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997); *Weber v. Weber*, 929 So. 2d 1165, 1168 (Fla. 2d DCA 2006). Because of its historic usage and explication in Florida common law, the term "domicile" is far clearer than other provisions that courts have

held not to be vague. *See Panther v. Hames*, 991 F.2d 576, 578 (9th Cir. 1993) ("When a term has a well-settled common law meaning, it will not violate due process notwithstanding an element of degree in the definition as to which estimates might differ."); *Graffam v. Town of Harpswell*, 250 F. Supp. 2d 1, 8–9 (D. Me. 2003) (holding that term "domicile" was not void for vagueness). In *Fowler*, for instance, a school rule proscribing "conduct unbecoming a teacher" was not unconstitutionally vague because it gave "adequate notice" to teachers. 819 F.2d at 664–66. So too for a similar standard requiring "sound scholarship and competent teaching." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992). And in *Arnett*, the Supreme Court held that the phrase "for such cause as will promote the efficiency of the service" gave federal employees constitutionally sufficient notice of possible grounds for termination. 416 U.S. at 158–64 (plurality op.).

Plaintiffs suggest that "domicile" is vague because the Board declared that it would only enforce the statute against individuals with an intent to return to "a foreign country of concern," as "demonstrated by an absence of seeking citizenship in the United States." BOG Guidance at 1, *supra* note 5. That the Board has channeled its own discretion for "the purposes of implementing and enforcing" SB 846 is hardly a vice, DE1 ¶ 80, and says nothing about vagueness. But even if the Board's interpretation conflicted with that of other state actors, like FIU, *see* DE1 ¶ 80 & n.19 (it does not), it would not show vagueness. It would merely raise an interpretive question for the Florida courts, which does not ipso facto mean a statute is vague.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Respectfully submitted on July 11, 2024.

ASHLEY MOODY
 *Attorney General*

HENRY C. WHITAKER (FBN 1031175)
 *Solicitor General*

/s/ *Daniel W. Bell*
DANIEL W. BELL (FBN 1008587)
 *Chief Deputy Solicitor General*

ROBERT S. SCHENCK (FBN 1044532)
 *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*henry.whitaker@myfloridalegal.com*
*daniel.bell@myfloridalegal.com*
*robert.schenck@myfloridalegal.com*

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on July 11, 2024, to all counsel of record.

<u>/s/ *Daniel W. Bell*   </u>
Chief Deputy Solicitor General
