UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-21129-CIV-JEM/EIS

ZHIPENG YIN, *et al.*,

      Plaintiffs,

v.

MANNY DIAZ, in his official capacity as
Commissioner of the Florida Department
of Education, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON THE
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

In this case, the Plaintiffs seek injunctive and declaratory relief based on claims that a 2023 Florida statutory enactment, SB 846 (now codified as Fla. Stat. § 288.860), is unconstitutional because it violates the supremacy clause and the federal preemption doctrine (Counts 1 and 2), the equal protection clause (Count 3), and the due process clause (Count 4). *See* ECF No. 1. The matter is now before the Court on the Plaintiffs' Motion for a Preliminary Injunction, ECF No. 20,[1] to which the Defendants filed a response in opposition, ECF No. 26, and the Plaintiffs filed a reply in support, ECF No. 29. After careful consideration of the parties' filings, the arguments presented at hearings before the Court, and the applicable law, and the undersigned being otherwise fully advised in the premises, the undersigned **RESPECTFULLY RECOMMENDS** that the Plaintiffs' Motion for a Preliminary Injunction, ECF No. 20, be **GRANTED IN PART.**

---

[1] The Honorable Jose E. Martinez, United States District Judge, referred the Plaintiffs' motion to the undersigned. ECF No. 23.

# I.      BACKGROUND

## A.  SB 846 – Fla. Stat. § 288.860

In 2023, the Florida State Legislature enacted Senate Bill 846 ("SB 846"), which Florida's Governor then signed into law and which is now codified as Florida Statute § 288.860.  *See* ECF No. 1 at ¶ 1; ECF No. 20 at 11; ECF No. 26 at 4; ECF No. 35 at 4.  In relevant part, SB 846 prohibits "a state university or state college authorized to expend state-appropriated funds" from "accept[ing] any grant from or participat[ing]" in any "partnership" or "agreement" "with any foreign principal" unless the Board of Governors or the State Board of Education deems that the partnership or agreement is "valuable" to students and the state university or state college and "is not detrimental to the safety or security of the United States or its residents."  Fla. Stat. § 288.860(3)(b), (c), (d), (e).  The law defines a "partnership" as "a faculty or student exchange program, a study abroad program, an articulation program, a recruiting program, or a dual degree program," Fla. Stat. § 288.860(1)(c), and it defines an "agreement" as "a written statement of mutual interest in academic or research collaboration," Fla. Stat. § 288.860(3)(a).  The law further defines a "foreign principal" in pertinent part as "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States."  Fla. Stat. § 288.860(1)(b)(4).  "'Foreign country of concern' means the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan Regime of Nicolás Maduro, or the Syrian Arab Republic . . . ."  Fla. Stat. § 288.860(1)(a).

The Florida Board of Governors, which "shall operate, regulate, control, and be fully responsible for the management of the whole university system," *see* Fla. Const. art. IX, § 7(d), *see also* Fla. Stat. § 20.155(4), thereafter issued a regulation for universities to obtain approval from the Board of Governors to enter into a partnership or agreement with a foreign principal.  Fla.

Univ. Bd. Governors Reg. § 9.012(8).  To request approval from the Board of Governors, each university must submit the following information with each request:

1.  Entity with which the university is entering into an agreement or partnership

2.  Location of the entity reported [in subsection (1)]

3.  Expected start and end date of the agreement or partnership

4.  Purpose and benefits of the agreement or partnership

5.  Any identified risks of the agreement or partnership

6.  Projected number of students, faculty, and university staff participating in the agreement or partnership

7.  Estimated budget and source of funds to support the agreement or partnership

8.  Other information as requested by the Chancellor

*Id.* § 9.012(8)(c)(1)-(8).  Similarly, the Florida Board of Education, which governs Florida public colleges, *see* Fla. Const. art. IX, § 8(d) ("The state board of education shall supervise the state college system as provided by law."); Fla. Stat. § 20.15, issued a rule requiring colleges seeking approval of a partnership or agreement with a foreign principal to provide the Board of Education with the same information enumerated above, as well as a draft of the agreement or partnership. Fla. Admin. Code R. 6A-14.097(4)(c).

SB 846 requires the Board of Governors and the Department of Education to submit an annual report to the Governor, the President of the Florida Senate, and the Speaker of the Florida House of Representatives "relating to partnerships and agreements of state universities and state colleges, respectively, with colleges and universities based in a foreign country of concern and with foreign principals" and must include at least the following information: (1) "[d]ata reflecting any . . . agreement [or] partnership . . . between a state university or state college and . . . a foreign principal"; (2) "[d]ata reflecting any office, campus, or physical location used or maintained by a

3

state university or state college in a foreign country of concern, or with a foreign principal"; and (3) "[t]he date on which any such . . . agreement [or] partnership . . . is expected to terminate." Fla. Stat. § 288.860(3)(f).  To implement the reporting mandate, the Board of Governors issued a regulation that largely mirrors the statutory language, *see* Fla. Univ. Bd. Governors Reg. § 9.012(9), and the Board of Education issued a similar rule that additionally requires state colleges to submit a copy of any agreement or partnership between the college and a foreign principal and a summary of the activities, communications, and fiscal transactions, *see* Fla. Admin. Code R. 6A-14.097(5)(a)-(d).

The Board of Governors may "sanction" a state university, and the Board of Education may "sanction" a state college, that, "without approval from the board, enters into a partnership or an agreement . . . with a foreign principal," and those sanctions may include "withhold[ing] additional performance funding" from the university or college.  Fla. Stat. § 288.860(3)(d), (3)(e); *see also* Fla. Stat. §§ 1008.32(4)(b)-(c), 1008.322(5)(a)-(b).

**B.  The Plaintiffs**

The Plaintiffs challenge the constitutionality of the statute on federal preemption, equal protection, and due process grounds and seek to preliminarily enjoin the statute until a final determination can be made on their claims.  *See* ECF Nos. 1, 20.

1.  Plaintiff Zhipeng Yin

Plaintiff Yin is a man of Asian descent and Chinese ethnicity.  ECF No. 20-11 (Declaration of Zhipeng Yin) at ¶ 2.  He is a native-born citizen of the People's Republic of China, and thus his national origin is Chinese.  *Id.* at ¶ 3; *see also* ECF No. 1 at ¶ 10.  Plaintiff Yin has sworn that he is neither a member of the Chinese government nor a member of the Chinese Communist Party.  ECF No. 20-11 at ¶ 4.  Plaintiff Yin is pursuing his doctoral studies in Computer and Information

Sciences. *Id.* at ¶ 9. He entered the United States in August 2021 under an F-1 student visa, and he is presently lawfully residing in the United States under a valid F-1 student visa. *Id.* at ¶¶ 7-8; ECF No. 20-12. On November 30, 2023, Plaintiff Yin received an offer from Florida International University ("FIU") to enroll in its Computer Science doctoral program. ECF No. 20-11 at ¶ 10; ECF No. 20-13 (Nov. 30, 2023 Letter from FIU); *see also* ECF No. 1 at ¶ 37; ECF No. 20 at 16. Accompanying the offer of admission, Plaintiff Yin also received an offer for a graduate teaching assistantship, which would begin on December 18, 2023, prior to the start of the Spring 2024 semester. ECF No. 20-11 at ¶ 10; ECF No. 20-13; *see also* ECF No. 1 at ¶ 37; ECF No. 20 at 16. The teaching position included an annual stipend of $27,510, a tuition waiver, and automatic enrollment in the FIU-sponsored graduate assistant health insurance program. ECF No. 20-11 at ¶ 10; ECF No. 20-13; *see also* ECF No. 1 at ¶ 37; ECF No. 20 at 16. On December 14, 2023, Plaintiff Yin accepted both FIU's offer to enroll in its Computer Science doctoral program and the accompanying teaching assistantship employment offer. ECF No. 20-11 at ¶ 11; *see also* ECF No. 1 at ¶ 37; ECF No. 20 at 16. On December 27, 2023, FIU issued to Plaintiff Yin a U.S. Immigration and Customs Enforcement I-20 Certificate of Eligibility for Nonimmigrant Student Status form ("I-20 Form"). ECF No. 20-11 at ¶ 11; ECF No. 20-14.

On January 9, 2024, after Plaintiff Yin had moved from New York to Miami in reliance on FIU's offers, FIU informed Plaintiff Yin that, although he was still admitted to FIU as a graduate student, the offer that FIU had made to him for the teaching assistant position and accompanying tuition waiver was deferred pursuant to "section 288.860, Florida Statutes, the Board of Governors amendment to Board Regulation 9.012 Foreign Influence, and further BOG guidance," until "fully approved under the new required approval process," which would take "several months." ECF No. 20-11 at ¶ 13; ECF No. 20-15 (January 9, 2024 Letter from FIU to Plaintiff Yin). Plaintiff Yin

was given the option to undergo the approval process for the teaching position, withdraw from such consideration, or defer student admission to a future term under different circumstances. *See* ECF No. 20-15. On April 5, 2024, Plaintiff Yin received an email from FIU's Knight Foundation School of Computing & Information Sciences Graduate Program Specialist concerning a graduate teaching position for the Summer 2024 semester. ECF No. 20-16 (April 5, 2024 Email); *see also* ECF No. 20-11 at ¶ 14. The email advised Plaintiff Yin that FIU had submitted a contract for Yin's teaching assistantship, pending satisfactory completion of the FIU Human Resources new hire sign-on process, a background check, and the "Foreign Influence clearance." ECF No. 20-16. That teaching appointment would begin on May 6, 2024, and end on August 2, 2024, and Plaintiff Yin would receive a total stipend of $6,877.50 for the semester. *Id.* Plaintiff Yin is paying his full FIU tuition costs out of pocket pending approval of the teaching assistantship. ECF No. 20-11 at ¶ 15; *see* ECF No. 20 at 16.

2. Plaintiff Zhen Guo

Plaintiff Guo is a man of Asian descent and Chinese ethnicity. ECF No. 20-2 (Declaration of Zhen Guo) at ¶ 2; *see also* ECF No. 1 at ¶ 38. Plaintiff Guo is a native-born citizen of the People's Republic of China, and thus his national origin is Chinese. ECF No. 20-2 at ¶ 3. Plaintiff Guo has sworn that he is neither a member of the Chinese government nor a member of the Chinese Communist Party. *Id.* at ¶ 4; *see also* ECF No. 1 at ¶ 38. Plaintiff Guo is also a student pursuing his doctoral studies in Materials Engineering. ECF No. 20-2 at ¶ 8; ECF No. 1 at ¶ 38. He entered the United States under an F-1 student visa to pursue his doctoral studies at FIU, and he is presently lawfully residing in the United States under a valid F-1 student visa. ECF No. 20-2 at ¶¶ 7-8; ECF No. 20-3. On September 6, 2023, Plaintiff Guo received an offer from FIU to enroll in the Department of Mechanical and Materials Engineering's doctoral program in Materials Science and

Engineering.  ECF No. 20-2 at ¶ 9; ECF No. 20-4 (Sep. 6, 2023 Letter from FIU); *see also* ECF No. 1 at ¶ 38; ECF No. 20 at 16.  On that same date, FIU also issued Plaintiff Guo an I-20 Form. ECF No. 20-2 at ¶ 3; ECF No. 20-5 (I-20 Form received by Plaintiff Guo).

On October 4, 2023, FIU sent another letter to Plaintiff Guo restating Guo's acceptance to the Mechanical and Materials Engineering doctoral program in Materials Science and Engineering and offering Plaintiff Guo a graduate teaching assistantship, which would begin on December 18, 2023, prior to the start of the Spring 2024 semester.  ECF No. 20-2 at ¶ 11; ECF No. 20-6 (Oct. 4, 2023 Letter from FIU); ECF No. 20-9; ECF No. 1 at ¶ 38; ECF No. 20 at 16.  The teaching position included an annual stipend of $27,510, a tuition waiver, and automatic enrollment in the FIU-sponsored graduate assistant health insurance program.  ECF No. 20-2 at ¶ 11; ECF No. 20-6; *see also* ECF No. 1 at ¶ 38; ECF No. 20 at 16.  FIU issued an updated I-20 Form to Plaintiff Guo on October 7, 2023 which reflected his teaching assistantship and tuition waiver.  ECF No. 20-2 at ¶ 12; ECF No. 20-7 (Updated I-20 Form received by Plaintiff Guo).

Plaintiff Guo traveled from China to the United States on December 16, 2023 in reliance upon FIU's offers.  *See* ECF No. 20-2 at ¶¶ 14, 16.  On December 20, 2023, FIU informed Plaintiff Guo that, although he was still admitted to FIU as a graduate student, FIU's offer to Plaintiff Guo for the teaching assistantship and accompanying tuition waiver was deferred pursuant to "section 288.860, Florida Statutes, the Board of Governors amendment to Board Regulation 9.012 Foreign Influence, and further BOG guidance," until "fully approved under the new required approval process," which would take "several months."  *Id.* at ¶ 14; ECF No. 20-8 (December 20, 2023 Letter from FIU to Plaintiff Guo); ECF No. 20 at 16.  FIU gave Plaintiff Guo the option to undergo the approval process for the teaching position, withdraw from such consideration, or defer student admission to a future term under different circumstances.  *See* ECF No. 20-8.  On January 19,

2024, FIU issued Plaintiff Guo another I-20 Form, again indicating that Plaintiff Guo's funding would come from the teaching assistantship and accompanying tuition waiver.  *See* ECF No. 20-2 at ¶ 16; ECF No. 20-10 (Second Updated I-20 Form received by Plaintiff Guo).  Plaintiff Guo is paying his full FIU tuition costs out of pocket pending approval of the teaching assistantship.  ECF No. 20-2 at ¶ 15; *see* ECF No. 20 at 16; *see also* ECF No. 1 at ¶ 38.

As of the filing of the Plaintiffs' Complaint, FIU had not requested approval from the Board of Governors for either Plaintiff Yin or Plaintiff Guo pursuant to SB 846, ECF No. 26 at 6; ECF No. 26-1 (Declaration of Emily Sikes) at ¶ 4, and the Court has not been informed of any subsequent request for approval.

### 3. Plaintiff Zhengfei Guan

Plaintiff Guan is a man of Asian descent and Chinese ethnicity.  ECF No. 20-1 at ¶ 2. Plaintiff Guan is a native-born citizen of the People's Republic of China, and his national origin is Chinese.  *Id.* at ¶ 3.  Plaintiff Guan has sworn that he is neither a member of the Chinese government nor a member of the Chinese Communist Party.  *Id.* at ¶ 4; *see also* ECF No. 1 at ¶ 40. Instead, Plaintiff Guan is a legal permanent resident ("LPR") of the United States.  ECF No. 20-1 at ¶ 7; *see also* ECF No. 1 at ¶ 40.

Unlike Plaintiffs Yin and Guo, Plaintiff Guan is a tenured Associate Professor at the University of Florida ("UF") in its Food and Resource Economics Department and is affiliated with UF's Institute of Food and Agricultural Sciences.  ECF No. 20-1 at ¶ 8; *see also* ECF No. 1 at ¶ 40.  In the fall of 2023, Professor Guan publicized, nationally and internationally, an employment opportunity for graduate students and postdoctoral researchers.  ECF No. 20-1 at ¶ 14; *see also* ECF No. 1 at ¶ 40.  The candidate he sought to hire for a postdoctoral associate position, Dr. Da Gao, was from China.  ECF No. 20-1 at ¶ 14; ECF No. 29-1 at ¶ 4; ECF No. 29-2; *see also*

ECF No. 1 at ¶ 40.  Dr. Gao was one of approximately 18 applicants, all of whom have been described as "international students."  ECF No. 20-1 at ¶ 14.  The internal approval process for Dr. Gao by UF Research Integrity, Security and Compliance (UF RISC), which UF undertook to satisfy the requirements of SB 846, delayed the intended start date of Dr. Gao's postdoctoral associate position under Professor Guan from October 16, 2023, first to November 15, 2023, and then indefinitely.  *See* ECF No. 29-2.  By late December, UF asked Professor Guan about pursuing an H-1B visa for Dr. Gao, instead of an F-1 visa.  *Id.* at 22.  On January 5, 2024, Dr. Gao advised Professor Guan that he accepted a competing offer outside of Florida, that is, a position with the Shanghai International Studies University.  *See id.* at 24-25; *see also* ECF No. 20-1 at ¶ 14; *see also* ECF No. 1 at ¶ 40.

As of the filing of the Plaintiffs' Complaint, UF had not requested approval from the Board of Governors to hire any graduate assistant for Professor Guan, ECF No. 26 at 7; ECF No. 26-1 at ¶ 5, and the Court has not been informed of any subsequent request for approval.

## II.    LEGAL STANDARD

The Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  To obtain a preliminary injunction, the Plaintiffs must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest."  *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also, e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam); *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1281 (N.D. Fla. 2022).  "Although a 'preliminary injunction is an extraordinary and drastic remedy,' it should be granted if 'the movant "clearly carries the burden of persuasion" as to the four prerequisites.'"  *Falls*, 609 F. Supp. 3d at 1281 (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th

Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974))); *see also FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). "No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another." *Falls*, 609 F. Supp. 3d at 1281 (citing *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL*, 866 F.3d at 1298 (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)); *see also Falls*, 609 F. Supp 3d at 1281.

The Plaintiffs' action challenges the constitutionality of a Florida state statute. *See* ECF No. 1. A litigant may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both. *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009); *see also, e.g.*, *Cooper v. Raffensperger*, 472 F. Supp. 3d 1282, 1289 (N.D. Ga. 2020). While a facial challenge asserts that the challenged statute "always operates unconstitutionally," an "as-applied challenge, by contrast, addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" *Harris*, 564 F.3d at 1308 (quoting *Black's Law Dictionary* 223 (7th ed. 1999)); *see also, e.g.*, *Cooper*, 472 F. Supp. 3d at 1289.

A facial challenge "seeks to invalidate a statute or regulation itself." *United States v. Pugh*, 90 F.4th 1318, 1325 (11th Cir. 2024) (quoting *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001)). "Generally, 'a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid or show that the law lacks a plainly legitimate sweep.'" *Pugh*, 90 F.4th at 1325 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)) (citations, alterations, and internal quotations omitted). "Although 'the

10

underlying facts' of the case 'are largely irrelevant' in a facial challenge, the facts may establish that circumstances exist under which the statute is valid." *Id.* (quoting *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1365 (11th Cir. 2021) (citing *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015), and *Miami Herald Publ'g Co. v. City of Hallandale*, 734 F.2d 666, 674 n.4 (11th Cir. 1984)), and citing *United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010)).

An "as-applied challenge, by contrast addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party." *Harris*, 564 F.3d at 1308 (11th Cir. 2009); *see also Cooper*, 472 F. Supp. 3d at 1289.   Where plaintiffs seek to vindicate their own rights, the challenge is as-applied. *Jacobs v. The Fla. Bar*, 50 F.3d 901, 906 (11th Cir. 1995); *see also DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007).   The Plaintiffs here challenge the constitutionality of the statute on its face and as applied. *See* ECF Nos. 1, 20.

The Court must also decide, as a threshold issue, whether the Plaintiffs have shown a likelihood that Plaintiffs have standing to challenge the statute.  *See Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024); *see also Falls*, 609 F. Supp. 3d at 1281-82 (The "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing.") (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring in part and dissenting)); *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278, 1283 (N.D. Fla. 2020) ("Plaintiffs cannot show a likelihood of success on the merits without showing they likely have standing.").   The Supreme Court's three-part test for standing requires plaintiffs to show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Am. All. for Equal Rights*, 103 F.4th at 772; *Falls*, 609 F. Supp. 3d at 1282.

With these principles in mind, the undersigned considers whether Plaintiffs have met the requirements for obtaining a preliminary injunction.

### III.    ANALYSIS

**A.  Likelihood of Success on the Merits**

"The first of the four prerequisites to temporary injunctive relief is generally the most important."  *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005) (citing *Gonzalez ex rel. Gonzalez v. Reno*, No. 00-11424-D, 2000 WL 381901 (11th Cir. Apr. 19, 2000)), *aff'd*, 403 F.3d 1223 (11th Cir. 2005); *see also, e.g.*, *Deutsche Bank Sec. Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465, at *3 (S.D. Fla. Aug. 20, 2019), *report and recommendation adopted*, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019).  Courts address this factor first "because, typically, if a plaintiff cannot 'establish a likelihood of success on the merits,' this Court 'need not consider the remaining conditions prerequisite to injunctive relief.'"  *Falls*, 609 F. Supp. 3d at 1281 (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

### 1.  Plaintiffs' Likelihood of Establishing Standing

The Defendants challenge the Plaintiffs' standing to challenge SB 846.  Article III of the U.S. Constitution "restricts the jurisdiction of the federal courts to litigants who have standing to sue."  *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1001 (11th Cir. 2016); *Asker v. Seminole Tribe of Fla., Inc.*, 730 F. App'x 751, 752 (11th Cir. 2018).  The standing doctrine stems directly from Article III's case or controversy requirement and implicates the court's subject matter jurisdiction.  *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (citing U.S. Const. art. III, § 2).

It is well-settled that a plaintiff must establish three elements to satisfy constitutional standing requirements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted); *Asker*, 730 F. App'x at 754-55.

"'Article III standing requires a concrete injury even in the context of a statutory violation.'" *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Article III standing is determined based on the facts as they exist when the complaint is filed. *See, e.g.*, *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). Each plaintiff must demonstrate standing.

> a. *Plaintiffs Guo and Yin Have Shown a Likelihood of Establishing Standing.*

Plaintiffs Guo and Yin, as post-graduate students at FIU, are similarly situated. Plaintiffs Guo and Yin claim to be suffering significant financial injury. *See* ECF No. 1 at ¶¶ 37-39; *see also* ECF No. 20 at 34-35. Accompanying their graduate teaching positions, Plaintiffs Guo and Yin would have received an annual stipend of $27,510.00, a tuition waiver totaling about $22,224.00 for Plaintiff Guo and a tuition waiver of 24 credits per year for Plaintiff Yin, and 75% coverage of their health insurance as part of the FIU-sponsored graduate assistant health insurance program. ECF No. 20-6; 20-13; *see also* ECF No. 1 at ¶¶ 37-39. Plaintiff Yin also bore expenses to relocate from New York to Florida in order to attend FIU and accept FIU's teaching position and signed a 13-month lease at a monthly cost of $2,600. ECF No. 20-11 at ¶ 20; ECF No. 20 at 17; *see also* ECF No. 1 at ¶ 37. FIU subsequently informed Plaintiffs Guo and Yin that they were no longer eligible for their teaching assistantships and the accompanying tuition waivers until their eligibility

for the assistantships was approved under the new approval process required by SB 846.  ECF No. 20-8; ECF No. 20-15; *see also* ECF No. 1 at ¶¶ 37-38.

In addition to financial injury, Plaintiffs Guo and Yin claim that, without their teaching assistantships, neither is now able to engage in close work with a professor, which is the "cornerstone" of a doctoral program.  ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18; *see also* ECF No. 1 at ¶ 39.  Both argue that a teaching assistantship is a "recognition of academic promise and a testament to the trust placed in" them by FIU and its faculty.  ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18.  Both claim that the recission of the offer of a teaching assistantship limits their exposure to innovative research, scholarly discourse, and publication opportunities; deprives them of the opportunity to build a network of peers and mentors; and stigmatizes them, causing feelings of isolation and vulnerability that are taking a psychological and emotional toll.  ECF No. 1 at ¶ 39; ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18.  Plaintiff Guo is also now deprived of access to a research laboratory, which has the potential to delay Plaintiff Guo's graduation, given that Plaintiff Guo is required to author a number of papers "for which access to a research laboratory is crucial."  ECF No. 1 at ¶ 39; ECF No. 20-2 at ¶ 18.  Plaintiff Yin alleges that SB 846 "is disrupting [his] and [his] family's careful plans for [his] doctoral studies."  ECF No. 1 at ¶ 39; ECF No. 20-11 at ¶ 18.

Plaintiffs Guo's and Yin's alleged financial injuries are sufficiently concrete.  *See, e.g.*, *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) ("[P]ointing to a direct harm is the most straightforward way to show a concrete injury . . . .  Such harms can be tangible or intangible.  Tangible harms are the most obvious and easiest to understand; physical injury or financial loss come to mind as examples."); *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1243 (11th Cir. 2022) ("The most obvious concrete harm is a physical injury or

financial loss."). The loss of tuition waivers, teaching stipends, and subsidized health insurance that were suffered by Plaintiffs Guo and Yin are actual, concrete injuries, as each has already been deprived of those benefits. *See* ECF Nos. 1, 20-2, 20-11. The letters from FIU indicate that the recission of their assistantship offers is due to the application of SB 846 and its requirement that approval be provided by the Board of Governors, establishing a traceable causal connection to the challenged conduct. *See* ECF Nos. 20-8, 20-15. The Defendants' argument that the Plaintiffs' injuries are traceable only to FIU because FIU did not submit SB 846 exemption requests for Plaintiffs Guo or Yin, *see* ECF No. 26 at 9, ignores the fact that FIU rescinded its offers to Plaintiffs Guo and Yin because of the prohibitions of SB 846, as demonstrated by the rescission letters from FIU to the student Plaintiffs, *see* ECF Nos. 20-8, 20-15, and that the recission of FIU's offers to Plaintiffs Guo and Yin and the loss of associated benefits are the injuries they allege, *see, e.g.*, ECF No. 1 at ¶ 10. Plaintiffs Guo and Yin have thus both stated concrete, particularized, and actual financial injuries that are traceable to the enactment of SB 846.

Plaintiffs Guo and Yin also allege intangible injuries that are sufficiently concrete and traceable to the enactment of SB 846 to establish their standing. Reputational and stigmatic harm are intangible injuries that give rise to Article III standing. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 n.7 (11th Cir. 2023) (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)) ("Constitutional harms . . . and reputational harms . . . are examples of traditional harms for purposes of Article III standing."); *see also id.* (citing *Laufer v. Arpan LLC*, 29 F.4th 1268, 1273 (11th Cir. 2022)) ("Stigmatic harm is another example of intangible injury giving rise to Article III standing."). Plaintiffs Guo and Yin allege the loss of "recognition of academic promise" and the "trust placed in" them—reputational harm—stemming from the recission of their assistantship offers as part of FIU's efforts to comply with SB 846. ECF No. 20-2 at ¶ 18; ECF

No. 20-11 at ¶ 18.  Plaintiffs Guo and Yin also allege that SB 846 stigmatizes them.  ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18.  These allegations are sufficient to establish a concrete injury traceable to the enactment of SB 846 for purposes of establishing the standing of Plaintiffs Guo and Yin.  *See, e.g.*, *Heres v. Medicredit, Inc.*, No. 23-CV-24815, 2024 WL 3291738 (S.D. Fla. July 3, 2024) (quoting *Lujan*, 504 U.S. at 561 ("At the pleading stage of a case, 'general factual allegations of injury' can suffice.")).

Finally, Plaintiffs Guo's and Yin's alleged injuries are redressable by a favorable decision from this Court granting the declaratory and injunctive relief requested by the Plaintiffs.  *See Lujan*, 504 U.S. at 560-61; *see also* ECF No. 1 at 31-32.  It is the Defendants here who are charged by statute with enforcing SB 846, approving or disapproving pertinent agreements, and imposing penalties for violations, *see* Fla. Stat. § 288.860(3)(d)-(e), so an injunction against the Defendants would redress Plaintiffs Guo's and Yin's injuries.  *See, e.g.*, *Am. Civil Liberties Union, Inc. v. Lee*, 546 F. Supp. 3d 1096, 1100 (N.D. Fla. 2021) (finding redressability for standing purposes where injunctive relief to stop enforcement of the disputed law was sought against the entity that would enforce the new law); *cf. Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (declining to find redressability where injunctive relief was sought against state attorney general but disputed law did not confer power on the attorney general to enforce the law).

Plaintiffs Guo and Yin have accordingly met their burden to show a likelihood that they have standing to proceed on their claims.

### b.  *Plaintiff Guan Has Not Shown a Likelihood of Establishing Standing.*

As a professor at UF, Plaintiff Guan is differently situated than Plaintiffs Guo and Yin. Plaintiff Guan does not claim a financial injury.  *See* ECF Nos. 1, 20, 20-1, 29-1.  Instead, Plaintiff Guan alleges that SB 846 is "undermining his ability to hire the best candidates to assist him"

because the graduate student to whom Professor Guan extended an offer "rejected it due to SB 846's discriminatory targeting of Chinese individuals and a four-month delay the law caused." ECF No. 20 at 35; *see also* ECF No. 1 at ¶¶ 10(b), 40(f).  The inability to hire that candidate "threaten[ed] existing grant funding and grant applications at a time when Plaintiff Guan is subject to a five-year post tenure review and promotion process" and "has had a significant negative impact on Plaintiff Guan's research on citrus."  ECF No. 20 at 35; *see also* ECF No. 1 at ¶ 40(f). Thus, Plaintiff Guan alleges his own injuries and is not merely seeking to vindicate the rights of others.  *See* ECF No. 29 at 7.

These alleged circumstances fail to establish that Plaintiff Guan has suffered an injury in fact, and, indeed, Plaintiff Guan presents no facts establishing that his claimed injuries are concrete and particularized.  *See* ECF Nos. 20, 29, 38.  "Claims of intangible harm . . . can be tricky: some are concrete, some are not."  *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020).  Here, Plaintiff Guan does not argue that the alleged "intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). Rather, Plaintiff Guan's standing argument amounts to a claim that his alleged injuries "do not result from a speculative chain of possibilities."  ECF No. 29 at 9 (internal quotations omitted); *see also* ECF No. 38 at 10.  Yet this conclusory argument, without more, does little to establish that his claimed injuries are concrete and particularized or that there is a causal connection to the enactment of SB 846.  On the contrary, notwithstanding his arguments to the contrary, Plaintiff Guan's claimed injuries (for example, that grant funding and grant applications may be threatened or that his research may be negatively impacted) and the asserted causal connection of those claimed injuries to SB 846 are in fact speculative.

17

These speculative injuries are additionally premised on the implication that SB 846 has deprived Plaintiff Guan of the ability to hire qualified candidates, but numerous candidates have in fact applied to Plaintiff Guan, and Plaintiff Guan has failed to allege or establish that those candidates were either unqualified or subject to SB 846's hiring approval process. *See* ECF No. 20-1 at ¶ 14(a).  In essence, Plaintiff Guan's claimed injury is nothing more than a claim that SB 846 makes it more difficult for state universities and colleges to hire teaching assistants who are domiciled in the countries specified in the statute, but that is neither a concrete nor a particularized injury suffered by Plaintiff Guan.  Additionally, to the extent that Plaintiff Guan's claimed injury is that he was deprived of the opportunity to hire one particular candidate (Dr. Da Gao), the record indicates that Dr. Gao, who does not even  appear to have obtained a visa authorizing him to work in the United States, *see* ECF No. 29-2 at 28-30, did not withdraw from consideration for the position with Plaintiff Guan until after he received and accepted a position from another university in China.[2]  *See, e.g.*, *id.* at 24; ECF No. 20-1 at ¶ 14(b).  In any event, to the extent that Plaintiff Guan's claimed injury is the inability to hire Dr. Gao, that claimed injury is not redressable by this action given that Dr. Gao withdrew from consideration for the position with Plaintiff Guan and decided to accept an offer of employment with a Chinese university and remain in China.

Plaintiff Guan has not met his burden of showing a likelihood of standing, and, as a result, the Court's analysis of Plaintiff Guan's request for a preliminary injunction concludes here; Plaintiff Guan is not entitled to a preliminary injunction.  *See Falls v. DeSantis*, 609 F. Supp. 3d

---

[2] While the undersigned recognizes that Dr. Gao reported that "the unreasonable policy at the University of Florida" contributed to his decision to look for other job opportunities, ECF No. 29-2 at 24, the fact remains that it was Dr. Gao who decided to take a position at a university in China. SB 846 did not require Dr. Gao to seek or accept that position.  Accordingly, the fact that Plaintiff Guan was ultimately unable to hire Dr. Gao was "the result of the independent action of some third party [Dr. Gao] not before the court," *Lujan*, 504 U.S. at 560.

1273, 1281, 1287 (N.D. Fla. 2022).  Further consideration of the four factors for granting a preliminary injunction will thus be confined to Plaintiffs Guo and Yin.

        2.   <u>The Plaintiffs Have Shown a Likelihood of Success on Their Preemption Claim.</u>

The Plaintiffs' first challenge to the constitutionality of SB 846 is that it is preempted by federal law, specifically the federal interests in national security and foreign affairs and federal immigration law.  *See* ECF Nos. 1, 20.

Federalism is "central to the constitutional design" and "adopts the principle that both National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).  "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Id.* at 399 (citing U.S. Const. art. VI, cl. 2).  Thus, Congress has the power to preempt state law.  *See id.*

"Absent explicit preemptive language, Congress' intent to supersede state law altogether may be found from a 'scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it,' 'because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 102 S. Ct. 3014, 3022 (1982) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))).  Alternatively, conflict preemption "arises when 'compliance with both federal and state regulations is a physical impossibility,'" *id.* at 204

19

(quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)), or "where, 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (alteration in original) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).   "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.   "The existence of a common goal 'hardly neutralizes the conflicting means,' and the fact that some [parties] may be able to comply with both [laws] does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ." *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1302 (S.D. Fla. 2008) (quoting *Crosby*, 530 U.S. at 379-80). "If the purpose of the [federal] act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Estrada v. Becker*, 917 F.3d 1298, 1308 (11th Cir. 2019) (quoting *Crosby*, 530 U.S. at 373 (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912))).   Thus, "[t]he crucial inquiry is whether a state law impedes the federal effort." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 53 (1st Cir. 1999).

The Supreme Court has instructed that "a preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal." *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (discussing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), and *Wis. Dep't of Industry, Lab. & Human Rels. v. Gould, Inc.*, 475 U.S. 282 (1986)).   Thus, even though a state "purport[s] to govern in an area of

traditional state concern," it cannot "'enforce the requirements' of federal regulations through its own statutory scheme." *Id.* (quoting *Gould, Inc.*, 475 U.S. at 291).

>    a.   *Plaintiffs Have Not Shown a Likelihood that SB 846 Is*
>         *Preempted as an Alien Registration Statute.*

First, the Plaintiffs argue that SB 846 is an alien registration statute, a field that Congress has fully occupied, and, as a result, SB 846 is field preempted.  The Supreme Court has invalidated state alien registration statutes on the ground that Congress intended its "'complete system for alien registration'" "to be a 'single integrated and all-embracing system'" which "'did not allow the States to 'curtail or complement' federal law or to 'enforce additional auxiliary regulations.'" *See Arizona v. United States*, 567 U.S. 387, 400-01 (2012) (quoting *Hines*, 312 U.S. at 66-67, 70, 74).  The Plaintiffs characterize SB 846 as "an additional state registration requirement upon nonimmigrants" because SB 846 requires Plaintiffs Guo and Yin to obtain "individualized exemption[s]" and Florida state colleges and universities to "tally exemptions to comply with an annual reporting requirement to Florida's top governmental leaders."  ECF No. 20 at 20.  The Defendants reject the Plaintiffs' characterization of SB 846 as an alien registration statute because "[t]he statute does not require aliens to 'complete or carry registration documents.'"  ECF No. 26 at 12 (quoting *United States v. Alabama*, 691 F.3d at 1282).

A review of SB 846 reveals that it is simply not an alien registration statute.  The statute does not require aliens to do anything whatsoever; instead, the pertinent provisions challenged by the Plaintiffs simply impose requirements on state colleges and universities to seek pre-approval for their employment of nonimmigrant aliens who are domiciled in countries "of concern" and to report *the colleges' and universities'* agreements with such individuals and data *about the colleges and universities*.  *See* Fla. Stat. § 288.860(3).  The Plaintiffs have not provided, and the undersigned has not found, any authority invalidating a state law as a field-preempted alien

registration requirement on the basis that the state law requires pre-approval by a particular state agency before the alien is employed by that state. *See* ECF No. 20. Notably, SB 846 does not require aliens from the countries "of concern" who are living in Florida or aliens from the countries "of concern" who are attending Florida colleges and universities to seek any approval from the Board of Governors; the statute simply requires that those nonimmigrant aliens who are domiciled in countries "of concern" *and who are seeking employment in a Florida public college or university*, and thus employment with the state itself, seek and obtain prior approval from the state's Board of Governors. *See* Fla. Stat. § 288.860. Given these circumstances, the Plaintiffs have not met their burden of showing a likelihood of success on their claim that SB 846 is constitutionally field preempted as an alien registration statute.

> b. *Plaintiffs Have Shown a Substantial Likelihood that SB 846 Is Conflict-Preempted by Federal Immigration Law and Federal Foreign Affairs Powers.*

Next, the Plaintiffs argue that SB 846 is conflict preempted by federal immigration law and both conflict and field preempted by the federal government's foreign affairs powers and national security interests. Because the federal government's immigration power stems from its foreign affairs powers, as explained below, the undersigned begins by addressing the federal government's foreign affairs and national security interests before addressing federal immigration law.

The Constitution grants the federal government vast power over foreign affairs. U.S. Const. art. I, §§ 8, 9, 10; U.S. Const. art. II, § 2; *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1313 (11th Cir. 2001); *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1316 (S.D. Fla. 2012), *aff'd sub nom. Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013). The Foreign Affairs Power "'is implied out of the grants of power to the federal government as a whole throughout the Constitution, as well as the restrictions on the states from engaging in certain foreign affairs activities in Article I.'" *Prasad*, 876 F. Supp. 2d at

1318 n.10 (quoting Leanne M. Wilson, *The Fate of the Dormant Foreign Commerce Clause After Garamendi and Crosby*, 107 Colum. L. Rev. 746, 760 (2007)). "This exclusive grant of power reflects a practical concern because '[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.'" *Id.* at 1316 (quoting *Hines*, 312 U.S. at 63).

Thus, "[t]here is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 427, n.25 (1964)). "For a state statute to encroach on the federal government's Foreign Affairs Power, it must have more than 'some incidental or indirect effect in foreign countries,' and have the potential for diplomatic 'disruption or embarrassment.'" *Prasad*, 876 F. Supp. 2d at 1316 (quoting *Zschernig v. Miller*, 389 U.S. 429, 434-35 (1968)); *see also ABC Charters*, 591 F. Supp. 2d at 1295. The First Circuit has articulated a five factor test for determining whether a state statute's effect on foreign countries is more than "incidental or indirect," which requires courts to consider (1) the design and intent of the law; (2) the amount of purchasing power the law affected; (3) the possibility of other states following the example; (4) the protests lodged by other foreign countries; and (5) the differences between the state and federal approaches. *See Natsios*, 181 F.3d at 53; *see also ABC Charters*, 591 F. Supp. 2d at 1295 (applying *Natsios* test after noting absence of Eleventh Circuit precedent); *Prasad*, 876 F. Supp. 2d at 1316 n.9. However, after the Eleventh Circuit did not apply the *Natsios* test in *Fac. Senate of Fla. Int'l*

*Univ. v. Winn*, 616 F.3d 1206 (11th Cir. 2010), at least one court in this district has declined to "rigidly adhere" to the First Circuit's five factor test, instead prioritizing the "general criteria" established in *Zschernig v. Miller*, that is, whether a statute has more than an incidental or indirect effect on foreign counties and has the potential for diplomatic disruption or embarrassment. *See Prasad*, 876 F. Supp. 2d at 1316 (citing 389 U.S. 429 (1968)). The undersigned does the same.

Similarly, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Federal immigration authority "rests, in part, on the National Government's constitutional power 'to establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394-95 (quoting U.S. Const. art. I, § 8, cl. 4 and citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). As the Supreme Court has recognized, "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395 (citing *Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1876)).

Significantly, "[t]he '[p]ower to regulate immigration is unquestionably exclusively a federal power,' and any state law that 'regulat[es] . . . immigration' is unconstitutional." *Estrada*, 917 F.3d at 1303 (quoting *De Canas v. Bica*, 424 U.S. 351, 354-55 (1976)). Thus, "the Constitution itself preempts any state effort to regulate immigration, even if Congress has not expressly or impliedly preempted the state regulation." *Id.* However, "the mere fact that a state law implicates the interest of persons who are the subject of federal regulation, even with respect to immigration, does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such

quintessentially local concern as employment." *Capron v. Off. Att'y Gen. of Mass.*, 944 F.3d 9, 24 (1st Cir. 2019); *see also Estrada*, 917 F.3d at 1306.

In 1952, Congress enacted the Immigration and Nationality Act (INA) as a "comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Toll*, 458 U.S. at 13 (quoting *Elkins v. Moreno*, 435 U.S. 647, 664 (1978)); *see also Kansas v. Garcia*, 589 U.S. 191, 195 (2020) (explaining that the INA "sets out the 'terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country'") (quoting *Chamber of Comm. v. Whiting*, 563 U.S. 582, 587 (2011)). The INA "recognizes two basic classes of aliens, immigrant and nonimmigrant." *Toll*, 458 U.S. at 13. The INA statutorily defines the classes of nonimmigrant aliens, "each distinguishable based on the type of visa granted and the alien's purpose for entering the United States." *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 40 (D. Me. 2022) (citing 8 U.S.C. § 1101(a)(15)), *aff'd*, 51 F.4th 1 (1st Cir. 2022).

Among those classes who are eligible for admission into the United States as nonimmigrants are qualifying foreign students. 8 U.S.C. §§ 1101(a)(15)(F)(i) (classifying as a nonimmigrant alien any "alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study"). A foreign student is eligible for admission into the United States under what is known as an F-1 visa if the student qualifies for and meets the pertinent eligibility requirements under federal immigration law. *See, e.g.*, 8 C.F.R. § 214.2(f)(1)(i); 8 U.S.C. §§ 1101(a)(15)(F)(i), 1182(a). An F-1 visa is of temporary, limited duration, and an F-1 student maintains his or her status under the visa during the time in which the "student is pursuing a full course of study at an educational

institution certified by SEVP[.]"[3]  8 C.F.R. § 214.2(f)(5)(i); 8 U.S.C. § 1101(a)(15)(F)(i); *see also* 8 C.F.R. § 214.2(f)(6).  Therefore, an F-1 student must pursue a "full course of study" in order to remain an F-1 student with permission to live in the United States under the visa.  "On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study."  8 C.F.R. § 214.2(f)(6)(i)(H); *see* 8 C.F.R. § 214.2(f)(9) (addressing authorized employment under F-1 visa); *see also* 8 C.F.R. § 214.2(f)(10) (addressing practical training that may also be authorized).

The INA also enumerates classes of aliens who are ineligible to receive a visa or to be admitted into the United States, reflecting the federal government's national security interests.  8 U.S.C. § 1182(a).  In part, these classes of ineligible aliens include:

- aliens seeking to enter the country to violate any law relating to espionage or sabotage or any law prohibiting the export from the United States of goods, technology, or sensitive information (*id.* § 1182(a)(3)(A)(i));

- aliens seeking to enter the country to engage solely, principally, or incidentally in any other unlawful activity or any activity with a purpose to oppose, control, or overthrow the government of the United States by force, violence, or other unlawful means (*id.* § 1182(a)(3)(A)(ii), (iii));

- aliens engaged or likely to engage in terrorist activity or aliens associated with terrorist organizations (*id.* § 1182(a)(3)(B)(i), (a)(3)(F));

- aliens whose entry or proposed activities "would have potentially serious adverse foreign policy consequences for the United States" (*id.* § 1182(a)(3)(C)(i)); and

---

[3] The Student and Exchange Visitor Program (SEVP) is a Department of Homeland Security (DHS) program that manages schools, nonimmigrant students in the F and M visa classifications, and their dependents on behalf of the DHS.  *See SEVP Overview*, Student and Exchange Visitor Program, https://www.ice.gov/sevis.  The SEVP also administers the Student and Exchange Visitor Information System (SEVIS).  *Id.*  The SEVP "collects, maintains, analyzes and provides information so only legitimate foreign students or exchange visitors gain entry to the United States. The result is an easily accessible information system that provides timely information to Department of State, U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enforcement (ICE), as well as a number of other federal enforcement agencies with 'need to know.'"  *Id.*

- "[a]ny immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign" (*id.* § 1182(a)(3)(D)(i)).

To ensure that those who are ineligible for a visa do not receive one, foreign nationals seeking visas must undergo admissibility reviews performed by Department of State consular officers.  *See* 8 U.S.C § 1202(h) (requiring, with certain exceptions, "every alien applying for a nonimmigrant visa . . . to submit to an in person interview with a consular officer"); *see also* Ruth Ellen Wasem, *Immigration: Visa Security Policies*, Congressional Research Service, at 5 (2015), https://sgp.fas.org/crs/homesec/R43589.pdf.  The visa applicant is required to submit a photograph and fingerprints, as well as full name (and any other name used or by which he or she has been known), age, and date and place of birth.  *See, e.g.*, 22 C.F.R. § 41.105(a)(3) ("Every applicant for a nonimmigrant visa must furnish photographs . . . ."); *id.* at § 41.105(b) ("Every applicant for a nonimmigrant visa must furnish fingerprints, as required by the consular officer."); 8 U.S.C. § 1202(c) ("In the application, the alien shall state his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed."); *see also* Wasem, *Immigration: Visa Security Policies*, Congressional Research Service, at 5.  Depending on the visa category, certain documents must be certified by government authorities.  *See* 8 U.S.C § 1202(d) ("Every alien applying for a nonimmigrant visa and alien registration shall furnish to the consular officer, with his application, a certified copy of such documents pertaining to him as may be by regulations required.").  Prospective nonimmigrants may also be required to undergo physical and mental examinations.  *Id.* at § 1201(d) ("Prior to the issuance of a nonimmigrant visa to any alien, the consular officer may require such alien to submit to a physical or mental examination, or both

. . . .").   Consular officers also screen all visa applicants using biometric and biographic information through a consular database system that is linked to other law enforcement records and databases, including DHS's Automated Biometric Identification System (IDENT), the Federal Bureau of Investigation's Integrated Automated Fingerprint Identification System (IAFIS), the Terrorist Screening Center (TSC) watchlist photos, and DHS's Traveler Enforcement Compliance System (TECS).   Wasem, *Immigration: Visa Security Policies*, Congressional Research Service, at 6.   In addition, all "[n]onimmigrant visa issuances must be reviewed" by consular supervisory personnel or designated alternates "to ensure compliance with applicable laws and procedures." 22 C.F.R. § 41.113(i).

The Plaintiffs argue that the extensive federal immigration system demonstrates that Congress has "occupied the field" with respect to national security and foreign affairs issues, and, as a result, that field is preempted and SB 846 is invalid "even if Florida's assertion of national security is parallel to or compliments [sic] the federal standard."   ECF No. 20 at 23-24.   However, as discussed, states may regulate in this space, so long as the impact of such regulations on foreign affairs is only "incidental" or "indirect" and does not cause "disruption or embarrassment." *Prasad*, 876 F. Supp. 2d at 1316 (quoting *Zschernig*, 389 U.S. at 434-45).   Thus, without more, the Plaintiffs have not met their burden of establishing a likelihood that SB 846 is field-preempted by the federal government's foreign affairs and national security interests.

The Plaintiffs also argue that SB 846 acts as a potential state veto to the federal government's determination that a visa holder does not pose a national security threat and is authorized to work in the United States, ECF No. 20 at 23-24, and that SB 846 "constitutes a direct and significant obstacle" to the F-1 visa program established by the INA, ECF No. 20 at 22.

The Defendants concede that SB 846 "is a 'security' statute," but they contend that it "looks inward to the State's own security interests."  ECF No. 26 at 18.  However, the plain language of SB 846 establishes that the "security interests" addressed by the statute are truly *national* security interests: an agreement or partnership with a "foreign principal" is permissible only if it "is not detrimental to the safety or security *of the United States or its residents*."  Fla. Stat. § 288.860(3)(d) (emphasis added).  As enacted, SB 846 requires the Board of Governors to make a national security determination about foreign students seeking employment at state colleges and universities, just as the federal government does when determining eligibility for and issuing visas to those students.  *Compare* Fla. Stat. § 288.860(3)(d) *with* 8 U.S.C. § 1182(a); *see also* Wasem, *supra*.  For example, although a student visa holder will have been found by the federal government to meet all of the eligibility requirements for the issued student visa, including satisfaction of national security concerns, *see, e.g.*, 8 U.S.C. § 1182(a), SB 846 requires the state of Florida to conduct an independent assessment of national security concerns that may result in a conflicting national security determination.  Indeed, SB 846's application to students who have been granted student visas serves no purpose other than to revisit, question, and potentially seek to override the federal immigration determination that the pertinent student does not pose a national security concern.  Although SB 846 may share the same laudable goal as the federal government's visa eligibility requirements to "protect[] American interests from foreign threats," *Governor Ron DeSantis Cracks Down on Communist China*, Executive Office of the Governor, Newsroom, (May 8, 2023), https://www.flgov.com/eog/news/press/2023/governor-ron-desantis-cracks-down-communist-china, there is an obvious "difference[] between the state and federal approaches," especially where SB 846 seeks to question and sit in review of federal national security determinations.  *ABC Charters*, 591 F. Supp. 2d at 1297.  By assigning to the Board of Governors what is essentially a review of

the federal immigration system's national security determinations, SB 846 interferes with the federal government's exclusive immigration authority and constitutes an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co.*, 461 U.S. at 204 (quoting *Hines*, 312 U.S. at 67); *see also Prasad*, 876 F. Supp. 2d at 1316.

Indeed, an SB 846 review, especially if it results in an outcome contrary to the INA-mandated national security review that resulted in the issuance of a student visa, serves to alter and limit the conditions of the student visa that was issued by the federal government, effectively limiting the student visa holder's eligibility for the opportunities otherwise bestowed by that student visa, most particularly, the opportunity for academic, education-related employment. Because "[o]n-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship" is specifically "deemed to be part of the academic program of a student otherwise taking a full course of study," 8 C.F.R. § 214.2(f)(6)(i)(H), such employment is part of the "academic program" of the F-1 visa holder and not mere employment. By regulating the on-campus employment of foreign students on the basis of national security, SB 846 thereby regulates the educational program of F-1 student visa holders and acts as an "obstacle" to the purpose of the F-1 visa program to allow admitted nonimmigrant student visa holders to pursue a "full course of study" in the United States. 8 U.S.C. § 1101(a)(15)(F)(i). Here, Plaintiffs have established that this practical result of SB 846 using national security and safety concerns to determine academic employment eligibility at Florida state colleges and universities for student visa holders is an "obstacle" that "clearly possess[es] the potential to disrupt the federal government's handling of

these issues." *See Prasad*, 876 F. Supp. 2d at 1317 (citing *United States v. Yoshida Int'l., Inc.*, 526 F.2d 560, 580, 63 C.C.P.A. 15 (C.C.P.A. 1975)); *United States v. Alabama*, 691 F.3d at 1296).[4]

The "design and intent" of SB 846—with its publicly announced goal to "root out Chinese influence in Florida's education system," *see Governor Ron DeSantis Cracks Down on Communist China*, *supra*—is also a clear "political statement of condemnation on the [seven] designated countries," particularly the People's Republic of China. *ABC Charters*, 591 F. Supp. 2d at 1296. Additionally, another stated goal of SB 846 is to "provide[] a blueprint for other states" in "protecting American interests from foreign threats." *Governor Ron DeSantis Cracks Down on Communist China*, *supra*. If SB 846 were to be replicated by other states, its impact on foreign relations would be greatly magnified. *See ABC Charters*, 591 F. Supp. 2d at 1297. Recognizing that "[f]oreign relations involve the delicate balancing of issues" and that the federal immigration system addresses the issues concerning eligibility for education and education-related employment in the United States by nonimmigrant students from foreign nations, SB 846 "clearly possesses the potential to disrupt the federal government's handling of these issues." *Prasad*, 876 F. Supp. 2d at 1317. Indeed, SB 846 likely has more than just "some incidental or indirect effect in foreign countries" and the potential for "diplomatic disruption or confusion." *Prasad*, 876 F. Supp. 2d at 1316 (quoting *Zschernig*, 389 U.S. at 434-35).

---

[4] The Court notes that the preemption of SB 846 will not deny Florida and its state colleges and universities discretion in making employment decisions concerning its students. State colleges and universities retain the discretion that they have always had to assess the academic qualifications, experience, and other pertinent factors in determining whether to accept and employ foreign students. The supremacy of federal immigration law concerning foreign student visas, established by the federal government pursuant to its exclusive immigration and foreign affairs powers, simply precludes the state from determining eligibility for the assessment of academic employment on the basis of national security concerns and the foreign student's country of domicile.

Here, the Plaintiffs have met their burden of establishing a substantial likelihood that SB 846 runs afoul of and is preempted by the federal government's Foreign Affairs Power, including its exclusive immigration powers.

### 3. Plaintiffs Have Not Shown a Likelihood of Success on Their Equal Protection Claim.

The Plaintiffs' next claim is that SB 846 violates the Equal Protection Clause of the Fourteenth Amendment, which requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV; *see also* ECF No. 1 at 26-28.  The Equal Protection guarantee "is essentially a direction that all persons similarly situated should be treated alike," *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985), and "is not confined to the protection of citizens," *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).  *See also Yick Wo*, 118 U.S. at 369 ("These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality . . . ."); *Plyler v. Doe*, 457 U.S. 202, 210-12 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments. . . . We have never suggested that the class of persons who might avail themselves of the equal protection guarantee is less than coextensive with that entitled to due process. . . . [B]oth provisions were fashioned to protect an identical class of persons . . . .").

"But, so too, '[the] Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'"  *Plyler*, 457 U.S. at 216 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).  "A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns, both public and private, and that account for limitations on the

practical ability of the State to remedy every ill." *Id.* "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440 (collecting cases). "The general rule gives way, however, when a statute classifies by race, alienage, or national origin." *Id.* This is because "[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *Id.* Laws classifying on these bases are usually subjected to strict scrutiny and are valid only if they are "narrowly tailored to achieve a compelling state interest." *Shen v. Simpson*, 687 F. Supp. 3d 1219, 1235 (N.D. Fla. 2023) (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)); *see also Cleburne*, 473 U.S. at 440.

Here, the Plaintiffs argue that strict scrutiny should apply because SB 846 discriminates on the basis of race, national origin, and alienage and is motivated by racial animus. *See* ECF No. 20 at 26-27. The Defendants argue that, although "SB 846 classifies based on alienage," rational basis scrutiny should apply because the Eleventh Circuit "decline[d] to extend the Supreme Court's decisions concerning *resident* aliens to different alien categories." ECF No. 26 at 20, 21 (quoting *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019)). While "[t]he Supreme Court's 'cases generally reflect a close scrutiny of restraints imposed by States on aliens,' the Court has 'never suggested' that *all* state alienage classifications are 'inherently invalid' or 'suspect.'" *Shen*, 687 F. Supp. 3d at 1235 (quoting *Foley v. Connelie*, 435 U.S. 291, 294 (1978) (citing *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973)).

Significantly, SB 846 does not facially discriminate on the basis of either race or national origin; it makes classifications based on where an alien is *domiciled*. *See* Fla. Stat. § 288.860(1)(a),

(1)(b)(4).  For example, SB 846 would not apply to a Chinese individual who is domiciled anywhere in the world but the seven countries of concern listed in § 288.860(a).  Moreover, SB 846 applies to any individual who is not a citizen or lawful permanent resident of the United States who is *domiciled* in any of seven countries of concern listed in § 288.860(a) *regardless of that individual's race or country of origin*.  In an effort to avoid the plain language of SB 846 and argue that the statute discriminates on the basis of race or national origin, the Plaintiffs rely on a theory of "proxy" discrimination, contending that "domicile" is a proxy for race and national origin.  ECF No. 20 at 27-28.  The Plaintiffs argue that "the statute, on its face, singles out people whose domicile is in China or the other countries of concern," ECF No. 29 at 16, and therefore necessarily singles out people born in those countries.  But unlike race, ancestry, or national origin, which are immutable characteristics established at birth, domicile is not fixed at birth.  Domicile is changeable over time and in many if not most cases reflects a person's active or passive choice.  Indeed, a person can change their domicile many times during their lifetime; they cannot change their race, ancestry, or national origin.  Plaintiffs have cited no authority establishing that "domicile" classifications are to be treated the same as the immutable birth classifications of race or national origin, and they have failed to establish that SB 846 classifies or discriminates on the basis of race or national origin.

SB 846 does, however, facially discriminate based on alienage, as Defendants themselves recognize.  *See* Fla. Stat. § 288.860(1)(b)(4); *see also* ECF No. 26 at 20.  The law only applies to a person who "is not a citizen or lawful permanent resident of the United States."  Fla. Stat. § 288.860(1)(b)(4).  "That the law exempts some noncitizens—those not domiciled in countries of concerns—does not make the law neutral as to alienage."  *Shen*, 687 F. Supp. 3d at 1236 (citing *Nyquist v. Mauclet*, 432 U.S. 1, 7-9 (1977), and *Graham v. Richardson*, 403 U.S. 365, 371-72

(1971)).  Thus, the question is whether the alien classification warrants rational basis or strict scrutiny.

The appropriate level of scrutiny to apply to laws impacting nonimmigrant visa holders has not been decided by the Supreme Court.  Where the Court has held that strict scrutiny should apply to alien classifications, those cases involved lawfully admitted resident aliens, not nonimmigrants.  *See Graham v. Richardson*, 403 U.S. 365 (1971); *Sugarman v. Dougall*, 413 U.S. 634 (1973); *In re Griffiths*, 413 U.S. 717 (1973); *Examining Board of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572 (1976); *Nyquist v. Mauclet*, 432 U.S. 1 (1977).[5]  Significantly, the rationale for applying strict scrutiny in cases involving lawful permanent residents simply does not apply to nonimmigrant students who are in the United States only for a limited, temporary purpose under an F-1 student visa.  The cases relied upon by the Plaintiffs do not establish otherwise.  Moreover, the Eleventh Circuit has recognized that Supreme Court cases applying strict scrutiny to laws affecting aliens did so based on laws that affected *resident aliens*, and the Eleventh Circuit has additionally "decline[d] to extend the Supreme Court's decisions regarding resident aliens to different alien categories."  *Estrada*, 917 F.3d at 1309-10 (quoting and following *LeClerc v. Webb*, 419 F.3d 405, 419 (5th Cir. 2005) (declining to apply strict scrutiny to rule affecting only nonimmigrant aliens)); *see also League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007) (declining to apply strict scrutiny to law affecting lawful temporary resident aliens).

---

[5] The Supreme Court has also declined to apply strict scrutiny in some circumstances where the challenged law applied to resident aliens. *See Foley v. Connelie*, 435 U.S. 291 (1978) (applying rational basis scrutiny to uphold a law that prohibited non-citizens, including permanent resident aliens, from working as police officers).

Nor have the Plaintiffs shown that the Court should review SB 846 under strict scrutiny because a racially "discriminatory intent" was a "motivating factor" in the enactment of the law. *See* ECF No. 20 at 29-30; *see also United States v. Felix-Salinas*, No. 5:21-cr-70-JA-PRL, 2022 WL 815301, at *2 (M.D. Fla. Feb. 2, 2022) (quoting *Hunt v. Cromartie*, 526 US 541, 546 (1999)) ("A facially neutral law . . . 'warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object[.]'"), *report and recommendation adopted*, 2022 WL 815271 (M.D. Fla. Mar. 17, 2022). "[A] law that is neutral on its face violates the Equal Protection Clause if discrimination was a substantial or motivating factor in the government's enactment of the law, and if the government cannot show that the law would have been enacted in the absence of any discriminatory motive." *I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014) (citing *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1043-45 (11th Cir. 2008)). "Proof of racially discriminatory intent or purpose is required." *Id.* (quoting *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985)). As proof, the Plaintiffs point to the statements from Governor Ron DeSantis's office about the enactment of SB 846 and Florida's apparent knowledge of SB 846's "overwhelming, if not exclusive, impact on Chinese individuals. *See* ECF No. 20 at 30. The Plaintiffs, however, provide no support for their assertions that SB 846 has an "overwhelming" or "exclusive" impact on Chinese individuals or that Florida had knowledge of any such impact. *Id.*; *see also* ECF No. 1. The plain language of SB 846 establishes that SB 846 is not, on its face, limited to Chinese individuals. *See* Fla. Stat. § 288.860(1)(a). Indeed, as discussed earlier, the law's focus is not on race, ancestry, or national origin, but country of domicile. Further, to the extent that comments made by Governor DeSantis's office discuss Chinese influence, these comments are focused on the Chinese Communist Party and not Chinese individuals generally.

*See Governor Ron DeSantis Cracks Down on Communist China*, *supra*.  The Plaintiffs therefore have not shown that strict scrutiny should be applied to SB 846 based on a racial animus or intent.

Here, rational basis scrutiny, rather than strict scrutiny, is properly applied to SB 846, and SB 846 survives the rational basis analysis because it bears a rational relation to the legitimate end of safeguarding national security.  *See, e.g.*, *Cleburne*, 473 U.S. at 440.  Indeed, the Plaintiffs do not argue that SB 846 fails to satisfy rational basis scrutiny.  *See* ECF Nos. 20, 29, 38.  As a result, the Plaintiffs have not carried their burden of showing a likelihood of success on the merits of their equal protection claim.

        4.   <u>Plaintiffs Have Not Shown a Likelihood of Success on their Due Process Claim.</u>

Next, the undersigned considers the Plaintiffs' likelihood of succeeding on the merits of the Plaintiffs' due process challenge to SB 846.  The Due Process Clause of the Fourteenth Amendment to the Constitution provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1.  Here, the Plaintiffs claim that SB 846 violates the Due Process Clause and is void for vagueness because of its use of "domicile."  *See* ECF No. 20 at 31-34; *see also* ECF No. 1 at ¶¶ 79-80.  More specifically, the Plaintiffs' challenge is based on the statute's use of a person's "domicile" in one of the statutorily-enumerated foreign countries "of concern" to define who qualifies as a "foreign principal" subject to SB 846's restrictions.  Fla. Stat. § 288.860(1)(b)(4).  Thus, the constitutional question of vagueness turns on the use of "domicile" in the statute and its meaning under Florida law.  *See Dream Defs. v. Governor of Florida*, 119 F.4th 872, 879-80 (11th Cir. 2024).

"Vagueness, an outgrowth of the Due Process Clause, reflects the 'fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.'"  *Pernell v. Fla. Bd. of Govs. of the State Univ. Sys.*, 641 F. Supp. 3d 1218, 1278 (N.D. Fla. 2022) (quoting *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012)).

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Dream Defs.*, 119 F.4th at 878-79; *Pernell*, 641 F. Supp. 3d at 1278.  When construing challenged provisions in state laws, "federal courts are without power to adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent."  *Pernell*, 641 F. Supp. 3d at 1279 (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988).  However, federal courts consider any limiting construction provided by a state court.  *See Dream Defs.*, 119 F.4th at 876-77 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)); *City of Chicago v. Morales*, 527 U.S. 41, 61 (1999) (A federal court has "no authority to construe the language of a state statute more narrowly than the construction given by that State's highest court.").

SB 846 does not define "domicile," and no Florida state court has offered a limiting construction of SB 846 that provides clarification of the meaning of "domicile" as used therein. *See* Fla. Stat. § 288.860.  But this absence alone does not render SB 846 unconstitutionally vague. "A statute is not void for vagueness where 'the meaning of the words used to describe the [impermissible] conduct can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning.'" *Boardwalk Bros., Inc. v. Satz*, 949 F. Supp. 2d 1221, 1227-28 (S.D. Fla. 2013) (quoting *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006)) (alteration in original).

"Domicile" has a common and generally accepted meaning in Florida common law.  *Shen*, 687 F. Supp. 3d at 1246 (concluding that "domicile" has a "settled meaning in Florida case law"). "[T]he domicile of a person is the place where he has his true, fixed, permanent home and principal

establishment, and to which, whenever he is absent, he has the intention of returning." *Minick v. Minick*, 149 So. 483, 487 (1933) (quoting 19 Corpus Juris, 392 *et seq*.); *see also, e.g.*, *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997) (recognizing that "'domicile' is the place where a person has fixed an abode with the present intention of making it his or her permanent home"). "The place is properly the domicile of a person in which he has voluntarily fixed his abode, not for a mere special or temporary purpose, but with a present intention of making it his permanent home." *Minick*, 149 So. at 487; *see Bloomfield v. St. Petersburg Beach*, 82 So. 2d 364, 368 (Fla. 1955); *see also, e.g.*, Fla. Stat. § 222.17 (manifesting and evidencing domicile in Florida requires showing of intent to maintain as permanent home); *McCormick v. Aderholt*, 293 F.3d 1254, 1257-58 (11th Cir. 2002) ("A person's domicile is the place of 'his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom . . . .'" (quoting *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974) (quoting *Stine v. Moore*, 213 F.2d 446, 448 (5th Cir. 1954))). Furthermore, "[o]nce established, a domicile continues until it is superseded by a new one. A domicile is presumed to continue, and the burden of proof ordinarily rests on the party asserting the abandonment of one domicile to demonstrate the acquisition of another." *Keveloh*, 699 So. 2d at 288 (citing *Texas v. Florida*, 306 U.S. 398 (1939), and *McDougald v. Jenson*, 786 F.2d 1465 (11th Cir. 1986)). Plaintiffs' efforts to argue that the term domicile is vague based on guidance provided by the Board of Governors of Florida and the State of Florida's arguments in litigation involving SB 264, another law enacted in conjunction with SB 846, *see* ECF No. 20 at 32-33, are unavailing and simply not render the statutory use of "domicile" in SB 846 vague. Furthermore, despite their arguments, *see* ECF No. 20 at 34, the Plaintiffs have also failed to establish that SB 846's use of the term domicile authorizes or encourages arbitrary or discriminatory enforcement.

Here, based on the "common and generally accepted meaning" of "domicile" recognized by Florida common law, the use of "domicile" in SB 846 is not unconstitutionally vague. *See* Fla. Stat. § 288.860; *Minick*, 149 So. at 487. Plaintiffs have accordingly failed to establish a likelihood of prevailing on the merits of their due process claim that "domicile" as used in SB 846 is unconstitutionally vague.

## B. Irreparable Injury

Plaintiffs Guo and Yin have also demonstrated that they will suffer irreparable harm absent entry of a preliminary injunction. Here, Plaintiffs Guo and Yin have shown that, as a result of SB 846, they will suffer stigma resulting from their denial of academic employment. *See* ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18. The application of SB 846 denies them the ability to work closely with a professor; deprives them of the public recognition of both FIU's trust and their academic promise; limits their exposure to innovative research, scholarly discourse, and publication opportunities; and deprives them of opportunities to build a network of peers and mentors. *See* ECF No. 20-2 at ¶ 18; ECF No. 20-11 at ¶ 18. Such consequences as the Plaintiffs are proceeding through their doctoral studies constitute irreparable injuries. *See, e.g.*, *Berber v. Wells Fargo Bank, N.A.*, No. 16-24918-CIV, 2017 WL 2417960 (S.D. Fla. June 2, 2017) (citing *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 382 F. Supp. 2d 1362, 1366 (S.D. Fla. 2005)) (stating that "the alleged injuries must be special or unique to be irreparable" and finding that the plaintiff's alleged depression did not constitute an irreparable injury), *report and recommendation adopted*, 2018 WL 10436231 (S.D. Fla. Mar. 13, 2018), *aff'd*, 760 F. App'x 684 (11th Cir. 2019); *Am. All. for Equal Rights*, 103 F.4th at 780 (concluding that loss of mentorship and business opportunities constitute irreparable injury). Due to the recission of his teaching assistantship, Plaintiff Guo has also lost the ability to conduct laboratory research, resulting in the loss of publishing opportunities.

*See* ECF No. 20-2 at ¶ 18.  Because publication of three or more "first-author papers" is required to receive his doctoral degree, *see id.*, these lost publishing opportunities also constitute irreparable injury.  *Cf. Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990) (stating that "[a] professional writer's loss of his ability to publish clearly constitutes an injury sufficient to permit him to resort to [] injunctive remedies").

Finally, the evidence establishes that the Plaintiffs have suffered and will continue to suffer significant monetary loss—including loss of tuition waivers traceable to the revocation of their teaching assistantship offers—that is not recoverable, constituting irreparable harm.[6]  *See Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (stating that "unrecoverable monetary loss is an irreparable harm"); *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) (same); *see also* ECF No. 20-2 at ¶¶ 16, 19; ECF No. 20-11 at ¶¶ 15, 19.

Accordingly, Plaintiffs have adequately established at this stage that they will suffer irreparable injury if a preliminary injunction is not granted.

### C.  Balance of the Equities and Public Interest

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public.  Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. HHS*, 19 F.4th 1271, 1293 (11th Cir. 2021) (citing *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).  The result is that the third and fourth injunctive factors merge into balancing the

---

[6] Significantly, the Defendants have not disputed that the economic losses suffered by the Plaintiffs are not recoverable under the circumstances presented in this case.  *See* ECF No. 26.  Indeed, apart from arguing that the Plaintiffs' delay in seeking a preliminary injunction militates against a finding of irreparable harm, *id.* at 7-8, the Defendants have not contested that the harms being suffered by the Plaintiffs are irreparable.

Plaintiffs' interests against the public interest.  *See* ECF No. 20 at 36.  Importantly, "'[t]he public has an interest in determining the constitutionality' of a challenged state or local ordinance or statute," *ABC Charters*, 591 F. Supp. 2d at 1310 (quoting *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 512 (M.D. Pa. 2007)), and "[t]he public has no interest in enforcing an unconstitutional ordinance," *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  Thus, the Plaintiffs' interest and the public interest are aligned.

Nor is there any harm to the State if an injunction is issued.  *See ABC Charters*, 591 F. Supp. 2d at 1311.  As discussed above, the national security and safety interests of the state are currently protected by the restrictions and protections of federal immigration law.  *See id.*; *see also* Section III.A.2.b, *supra*.  With the issuance of a preliminary injunction, the only "harm" the Defendants will conceivably suffer "will be a return to the status quo[,]" and the Defendants "have not shown that the status quo ante has presented a problem or injured anyone."  *ABC Charters*, 591 F. Supp. 2d at 1311.  In contrast, Plaintiffs Guo and Yin will be irreparably injured if SB 846 continues to be enforced.  Accordingly, these factors weigh in the Plaintiffs' favor.

Having satisfied all four factors, the Plaintiffs have established their entitlement to a preliminary injunction pending the outcome of the litigation of the merits of this case.

## IV.   CONCLUSION

Accordingly, and for the reasons stated above, the undersigned **RESPECTFULLY RECOMMENDS** that Plaintiffs' Motion for Preliminary Injunction, ECF No. 20, be **GRANTED IN PART**, and that a preliminary injunction be entered that enjoins the enforcement of Fla. Stat. § 288.860(d)-(e) to prohibit student employment at Florida's state universities and colleges, including the employment of Plaintiffs Yin and Guo, that has already been authorized by F-1 visas issued by the federal government.

Within fourteen (14) days from the date of receipt of this Report and Recommendation, the parties shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Jose E. Martinez, United States District Judge.  Failing to file timely objections will bar a *de novo* determination by the District Judge of any issue addressed in the Report and Recommendation, will constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions," and will only allow appellate review of the district court order "for plain error if necessary in the interests of justice."  11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY RECOMMENDED** in Chambers in Miami, Florida, this 10th day of February 2025.

EDUARDO I. SANCHEZ
UNITED STATES MAGISTRATE JUDGE

cc:     Hon. Jose E. Martinez
        Counsel of Record